**CENTRAL STATES INDUSTRIAL SUPPLY, INC., and CPI Sales, Inc., Plaintiffs,**

v.

**Steve McCULLOUGH, Defendant.**

**No. C02–0052–MWB.**

United States District Court,
N.D. Iowa,
Cedar Rapids Division.

Sept. 3, 2003.

---

Jennifer Rinden, Mark L. Zaiger, Shuttleworth & Ingersoll, Cedar Rapids, IA, for Plaintiffs.

Rebecca A. Brommel, Scott Lamoine Long, Brown, Winick, Graves, Gross, Baskerville, Schoenebaum, Des Moines, IA, for Defendant.

## MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BENNETT, Chief Judge.

### TABLE OF CONTENTS

I. INTRODUCTION ................................................1012
 A. Factual Background ......................................1012
 1. CSIS's acquisition of CPI .........................1012
 2. McCullough's 1998 Employment Agreement .........1013
 3. The 1999 Stock Repurchase Agreement and Addendum ..............1014
 4. McCullough's alleged wrongdoing .................1014
 B. Procedural Background ..................................1016
 1. The plaintiffs' claims and the defendant's response .................1016
 2. The motions for summary judgment and to strike affidavits .........1017

II. THE MOTION TO STRIKE AFFIDAVITS ................................1017
 A. Arguments Of The Parties ..............................1017
 B. Analysis ..............................................1018
 1. Anderson's affidavit ............................1018
 a. Rule 56(e) requirements ......................1018
 b. Contradiction of prior testimony ...............1019
 c. Specific paragraphs of the affidavit ...........1020
 2. Langer's affidavit ..............................1024
 3. McCullough's request for sanctions .............1026
 4. Alternative analysis ...........................1026

III. THE MOTION FOR SUMMARY JUDGMENT ..............................1026
 A. Standards For Summary Judgment ......................1026
 B. The Breach–Of–Contract Claims ........................1027
 1. Enforceability of the 1998 Employment Agreement ..................1028
 a. Arguments of the parties ......................1028
 b. Stenger's capacity to contract on CPI's behalf ..................1029

 *c. Adequacy of consideration* ........................................1030
 *2. Was the 1998 Employment Agreement superseded?* ...................1031
 *a. Arguments of the parties* ........................................1031
 *b. Effect of the 1999 Stock Repurchase Agreement and Addendum* ....1032
 *i. Rules of interpretation and construction* .....................1032
 *ii. Interpretation and construction of the pertinent terms* .......1033
 *3. Did McCullough breach the 1998 Employment Agreement?* ...........1034
 *a. Count I: Removal or retention of confidential information* ........1035
 *i. Arguments of the parties* .................................1035
 *ii. Analysis* ...............................................1035
 *b. Count II: Disclosure of confidential matters* ....................1036
 *i. Arguments of the parties* .................................1036
 *ii. Analysis* ...............................................1036
 *C. The Trade Secrets Act Claim* .........................................1037
 *1. Arguments of the parties* ...........................................1037
 *2. Analysis* ...........................................................1038
 *a. "Trade secrets"* ................................................1038
 *b. "Misappropriation"* ............................................1039
 *D. Breach Of Fiduciary Duty* ............................................1041
 *1. Arguments of the parties* ...........................................1041
 *2. Analysis* ...........................................................1042
 *a. Fiduciary duties* ...............................................1042
 *b. Disclosure of proprietary information* ..........................1043
 *c. Solicitation of employees* .......................................1043

*IV. CONCLUSION* ...................................................1047

Convinced that the defendant, the departing president and chief operating officer of the company, pirated confidential information before jumping ship to work for a competitor and that he also solicited other employees to join him at his new employer, the plaintiffs did not just get mad, they got an attorney. In his motion for summary judgment, however, the defendant contends that the plaintiffs really have nothing to be mad about. The court must decide whether the plaintiffs' claims of breach of contract, breach of fiduciary duty, and violation of the Iowa Trade Secrets Act are subject to genuine issues of material fact, which a jury must decide, or fail as a matter of law.

## I. INTRODUCTION

### A. Factual Background

Whether or not a party is entitled to summary judgment ordinarily turns on whether or not there are genuine issues of material fact for trial. *See, e.g., Quick v.*

*Donaldson Co.,* 90 F.3d 1372, 1376–77 (8th Cir.1996). Nevertheless, the court will not attempt here a comprehensive review of the undisputed and disputed facts in the record. Rather, the court will present here only sufficient factual background to put in context the parties' arguments for and against summary judgment on the plaintiffs' claims. More attention will be given to specific factual disputes, where necessary, in the court's legal analysis, below.

### 1. CSIS's acquisition of CPI

In early 1998, plaintiff Central States Industrial Supply, Inc. (CSIS), an industrial supply company incorporated in Nebraska, acquired all of the shares of plaintiff CPI Sales, Inc. (CPI), an Iowa corporation.[1] Prior to CSIS's acquisition of CPI,

---

1. Although the plaintiffs' Complaint and the parties' various statements of undisputed and disputed facts do not indicate precisely the nature of either CSIS's or CPI's business, it appears from evidence submitted in support of or resistance to the defendant's motion for summary judgment, particularly depositions of principal actors, that CSIS supplies pipe

defendant Steve McCullough was the president of CPI. The principals of CSIS, Richard Stenger and Harry S. Anderson—who each owned or controlled fifty percent of the shares of CSIS at the times pertinent to the claims in this action—desired to retain McCullough in that position after CSIS acquired CPI. Therefore, on January 5, 1998, Stenger, acting as the "Secretary/Treasurer" of CPI, entered into an Employment Agreement (the 1998 Employment Agreement) with McCullough concerning his continued employment with CPI after CSIS acquired CPI.

### 2. McCullough's 1998 Employment Agreement

Somewhat more specifically, the recitals at the beginning of the Employment Agreement included the following:

> WHEREAS, Employer [elsewhere identified as CPI] operates and owns an industrial supply business with its headquarters in Cedar Rapids, Iowa, and has recently changed ownership but desires to continue with Steve McCullough as an employee of CPI Sales, Inc. and Steve McCullough is desirous of continuing employment with CPI Sales, Inc. under its new ownership and is willing to be so employed;
>
> NOW THEREFORE, in consideration of the mutual promises of the parties and other good and valuable consideration, the parties agree as follows....

Defendant's Appendix at 51, Exhibit F (1998 Employment Agreement). The parties apparently do not dispute that, before and after the acquisition, McCullough was employed as the president of CPI and that his duties remained essentially the same after the acquisition as they were before it.

However, CSIS and CPI contend, and McCullough does not appear to dispute, that McCullough's annual salary was increased by $10,000 and that he obtained certain new bonus provisions under the terms of the 1998 Employment Agreement.[2] The 1998 Employment Agreement provided for McCullough's employment "commenc[ing] on the 5th day of January, 1998 and continu[ing] indefinitely, unless terminated for reasons hereinafter set forth." *Id.* at ¶ 4. The parties agree that McCullough's employment was "at-will." *See also id.* at ¶ 7 ("Termination" clause providing that "[t]his arrangement may be terminated by Employer at any time during the term hereof upon failure of Employee to devote his full time efforts to the sale of Employer's services and products, or upon conduct by Employee of a fraudulent, dishonest, or incompetent nature, *or at will of the employer.*") (emphasis added).

The key provision of the 1998 Employment Agreement, however, at least from the plaintiffs' present perspective, was neither the recitals nor the compensation and termination provisions, but the provision concerning proprietary information. That provision states the following:

> 5. *Proprietary Information.* Employee acknowledges that the list of Employer's customers and the manufacturing representative contracts which it has with, but no [sic] limited to, Viking, Wilden, Waukesha, Goulds and Allis Chalmers, as they now exist or as they now exist [sic] or as they CPI exist from time to time [sic] are valuable, special and unique assets of the business and

valves, fittings, and pumps, and related services to various industrial customers in Iowa and Nebraska and that, both before and after its acquisition by CSIS, CPI engaged in similar business, primarily in Iowa.

2. McCullough does contend, however, that the affidavit of Harry Anderson, which avers to the increase in McCullough's salary, should be stricken, as explained more fully herein.

that certain papers, records, information, programs and other products are also valuable, special and unique to Employer's business. Employee agrees that during and after the term of this Agreement, he will not disclose the list of those customers or manufacturing representative contracts or any part thereof to any firm, person, association or corporation or other entity for any reason or purpose whatsoever and will not during or after the term disclose any papers, records, programs, products or any other information relative to Employer's business. Employee agrees that in addition to not disclosing any of the above, he will not in any way use such proprietary information during the contractual arrangement or thereafter, whether such arrangement ultimately terminates prior to the contract term or thereafter, and in the event of a breach can be enjoined.

1998 Employment Agreement, ¶ 5.

Although Stenger signed the 1998 Employment Agreement on January 5, 1998, as "Secretary/Treasurer" of CPI, McCullough points out that Stenger was not actually elected to the board of directors of CPI, and CSIS's acquisition of CPI was not complete, until January 20, 1998. *See* Defendant's Appendix at 54, Exhibit G (Minutes of Special Meeting of Shareholders of CPI, Inc., on January 20, 1998). However, CSIS and CPI contend that there is no dispute that both parties continued to operate under the 1998 Employment Agreement after January 20, 1998, nor is there any dispute that McCullough has never returned the fruits of the 1998 Employment Agreement.

### 3. The 1999 Stock Repurchase Agreement and Addendum

On October 5, 1999, the parties also executed a Stock Repurchase Agreement. *See* Defendant's Appendix at 54–59, Exhibit H (Stock Repurchase Agreement). Paragraph 4(b) of the Stock Repurchase Agreement states, "The parties hereto understand and agree that Steve McCullough may leave the Corporation at any time *and is not bound by any employment agreement,* and that upon doing so, he must sell and the Corporation must buy his stock under the conditions set forth above." *Id.* at 55, Stock Repurchase Agreement ¶ 4(b) (emphasis added). On April 12, 2000, the parties executed an Addendum to the Stock Repurchase Agreement, correcting the number of shares of CPI issued to McCullough, but otherwise reiterating the binding effect of the October 5, 1999, Stock Repurchase Agreement. *See* Defendant's Appendix at 60–61 (Exhibit I). McCullough contends that the 1999 Stock Repurchase Agreement superseded the 1998 Employment Agreement. The plaintiffs disagree.

### 4. McCullough's alleged wrongdoing

At some point, McCullough became chief operating officer of CSIS as well as president of CPI. However, on July 16, 2001, McCullough tendered his letter of resignation from CSIS and CPI, indicating that his employment with those companies would end on July 27, 2001. *See* Defendant's Appendix at 62, Exhibit J. This lawsuit arises from McCullough's alleged misconduct just before and subsequent to his resignation from CSIS and CPI.

CSIS and CPI contend that, prior to his resignation, McCullough and another employee of CSIS and CPI named Christiaan Nielsen had been negotiating to purchase a competing business, Fluid Technology in Des Moines, Iowa, even though the pur-

chase of Fluid Technology was a potential corporate opportunity for CSIS and CPI. McCullough denies this allegation, because he and Nielsen had only one meeting with the owner of Fluid Technology after which he contends that they decided not to pursue any alleged "opportunity" to purchase that business. Also, CSIS and CPI contend that McCullough advised CSIS and CPI to pass up an opportunity to purchase Lincoln Supply, which was the Minnesota distributor and integrator for Waukesha, one of CSIS's and CPI's primary suppliers. McCullough admits this allegation, but contends that it is not relevant to any claim asserted by CSIS and CPI. CSIS and CPI contend that, prior to McCullough's resignation, McCullough and Nielsen also had several contacts with Steve Isenberg, the owner of Custom Repair and Fabricating d/b/a Fluid Solutions (Fluid Solutions), a Minnesota business in competition with CSIS and CPI. It is undisputed that McCullough and Nielsen left their employment with CSIS and CPI to go to work for Fluid Solutions and that Fluid Solutions is now serving as the distributor and integrator for Waukesha in Minnesota, Iowa, and Nebraska.

CSIS and CPI contend, and McCullough does not deny, that two days prior to resigning from CSIS and CPI, McCullough made copies of the entire CPI database at home. Although it is the "copying" that appears to be the real issue of significance, and McCullough admits copying the information, the parties apparently dispute whether McCullough used his "home computer" or a laptop computer provided to him by CSIS and CPI and a CD "burner" to perform the copying. There is no dispute that the copied information included significant amounts of company information about histories of company pump and valve sales, contracts, prices, vendor sources, sales literature, phone contacts, equipment database, and inventory. CSIS and CPI contend that McCullough made

two copies of this information and turned one copy over to his brother-in-law, Don Hull, who was also an employee of CSIS and CPI, so that Hull could use the information in his "side business" of laser alignment. Hull testified in deposition that he had no use for such information from McCullough, because he had access to it himself from CPI's database, had he wanted it. CSIS and CPI allege that McCullough contacted Hull to ask him to fabricate a story about how Hull needed the disks for his laser business, and McCullough admits that Hull so testified, but McCullough denies the substance of the allegation, in part, because he alleges that he was not even aware of Hull's laser business at the time that he gave the disks to Hull, so that he thought he was only giving the disks to another CPI employee. McCullough also denies CSIS's and CPI's allegation that he contacted Hull to try to "get their stories straight" before Hull's deposition, although he admits that Hull testified to such a supposed conversation. McCullough also claims that he mailed the other copy of the information he had downloaded to CSIS, but CSIS and CPI deny that they ever received such a copy of the information.

CSIS and CPI contend that, prior to his departure, McCullough told Steve Anderson that if he ever left CSIS and CPI, he would take Christiaan Nielsen with him, and that he also told other employees of CPI that he could take Tim Bracht, another CPI employee, with him to Fluid Solutions. McCullough disputes that he ever made such statements or that he made any similar statements in anything but a "joking" manner. However, Nielsen resigned from CSIS and CPI the same day as McCullough and joined him at Fluid Solutions and Bracht also subsequently left CSIS and CPI to work for Fluid Solutions. CSIS and CPI also contend that McCullough solicited Don Hull to

join him at Fluid Solutions or to take a job with another competitor of CSIS and CPI in order to "hurt them bastards out there," meaning CSIS and CPI. However, Hull declined to leave CSIS and CPI. McCullough denies that he ever solicited Hull to leave CSIS or CPI. McCullough also counters that any employees besides himself who left CSIS or CPI did so on their own initiative and that, at most, he provided those employees with information about positions available at Fluid Solutions upon their request.

CSIS and CPI also contend that McCullough told Mike Langer, another employee of CPI, that McCullough would get Waukesha and Wilden, two suppliers for whom CSIS and CPI were distributors or exclusive distributors in Iowa and Nebraska, to go with him to Fluid Solutions and that Fluid Solutions is, in fact, now a distributor for Waukesha and Wilden in Iowa and Nebraska, suggesting fulfillment of McCullough's threat or boast. However, McCullough disputes the relevance of these facts, because he contends that CSIS and CPI have not asserted any claim with respect to McCullough's role in Fluid Solutions's distribution of Wilden or Waukesha products. CSIS and CPI also contend that Fluid Solutions has been doing business with General Mills in Cedar Rapids, which had been a customer of CSIS and CPI, including selling to General Mills approximately $8,000 worth of valves, which constituted an order that CSIS and CPI could have filled. McCullough denies this allegation.

### B. Procedural Background

#### 1. The plaintiffs' claims and the defendant's response

In response to McCullough's alleged wrongdoing, CSIS and CPI filed the present lawsuit against McCullough on March 21, 2002. Count I of CSIS's and CPI's Complaint is denominated "Breach of Contract—Removal or Retention of Confiden-

tial Information." *See* Complaint, Count I. This Count alleges that, prior to and after his voluntary termination, McCullough breached paragraph 5 of the 1998 Employment Agreement by removing and retaining certain confidential information that constitutes CPI's proprietary and trade secret information. *Id.* Count II of the Complaint, denominated "Breach of Contract—Confidential Matters," also alleges that McCullough breached paragraph 5 of the 1998 Employment Agreement, but McCullough's breach in this Count is alleged to be disclosure in his employment with Fluid Solutions of confidential and proprietary information of CPI to which McCullough had gained access and working knowledge during his employment with CPI. *See id.,* Count II. Count III of the Complaint, denominated "Iowa Trade Secrets Act," alleges that, in the course of his employment with CPI, McCullough had access to and became intimately familiar with CPI's trade secrets, as defined by IOWA CODE § 550.2(4), and that McCullough's taking of CPI's trade secrets and his employment with Fluid Solutions has resulted and will result in disclosure of CPI's trade secrets constituting "misappropriation" under IOWA CODE § 550.2(3). *Id.,* Count III. Finally, Count IV of the Complaint, denominated "Breach of Fiduciary Duty," alleges that McCullough has breached fiduciary duties owed to CPI, including but not limited to his duty of loyalty and his duty not to take for unauthorized purposes or to disclose information that his employer regarded as confidential, and that he has done so by (1) soliciting and enticing employees of CPI to leave their employment with CPI to commence employment with a direct competitor, Fluid Solutions, and (2) by improperly taking, using, retaining, and removing CPI's trade secret information. *Id.,* Count IV. CSIS and CPI seek damages and injunctive relief on their various claims.

By order dated August 26, 2002, this court denied McCullough's motion to dismiss for improper venue pursuant to Rule 12(b)(3) and his alternative motion to stay proceedings. Therefore, McCullough filed his Answer, Affirmative Defenses, and Jury Demand on September 11, 2002. In addition to denying CSIS's and CPI's claims, McCullough pleaded affirmative defenses of laches, release, waiver, estoppel, and invalidity of the 1998 Employment Agreement on the ground that it was superseded by the 1999 Stock Repurchase Agreement and its Addendum. This matter thereafter proceeded to the discovery phase. Trial is currently set to begin on December 15, 2003.

### 2. The motions for summary judgment and to strike affidavits

On July 1, 2003, McCullough filed the present Motion for Summary Judgment (docket no. 21) on all of CSIS's and CPI's claims. CSIS and CPI resisted McCullough's motion for summary judgment on July 24, 2003, and McCullough filed a reply in further support of his motion on August 7, 2003. Also on August 7, 2003, McCullough filed a Motion To Strike Affidavits Of Steven Anderson And Mike Langer (docket no. 34). Because oral arguments on McCullough's motion for summary judgment had been scheduled for August 13, 2003, the court accelerated the deadline for the plaintiffs' response to McCullough's Motion To Strike Affidavits to August 12, 2003. The plaintiffs responded by faxing the court a resistance brief on August 12, 2003.

The court's schedule required rescheduling of the oral arguments on McCullough's motion for summary judgment, but the court eventually heard those arguments on August 20, 2003. At the oral arguments, plaintiffs CSIS and CPI were represented by Mark L. Zaiger of Shuttleworth & Ingersoll, P.L.C., in Cedar Rapids, Iowa. Defendant Steve McCullough was represent-

ed by Rebecca A. Brommel of Brown, Winick, Graves, Gross, Baskerville and Schoenebaum, P.L.C., in Des Moines, Iowa. After the oral arguments, the parties were permitted to submit responses by letter to a question posed by the court concerning record evidence in support of part of the plaintiffs' claim of solicitation of employees. The plaintiffs submitted their letter on August 20, 2003, and McCullough submitted his response on August 21, 2003. Therefore, McCullough's motions to strike affidavits and for summary judgment are now fully submitted.

## II. THE MOTION TO STRIKE AFFIDAVITS

### A. Arguments Of The Parties

In his motion to strike affidavits, McCullough seeks to strike the affidavits of Steve Anderson and Mike Langer. McCullough contends that Steve Anderson's affidavit fails to comply with Rule 56(e) of the Federal Rules of Civil Procedure, because it is not based upon Anderson's "personal knowledge," but only "on information and belief" and hearsay. McCullough also contends that a number of Anderson's statements in his affidavit, which McCullough identifies specifically, conflict with his prior deposition testimony, do not fit the narrow exception for subsequent affidavits after a witness has been deposed, or are inadmissible or irrelevant to the issues at hand.

CSIS and CPI disagree. They argue that McCullough has failed to identify any real contradictions in Anderson's affidavit; rather, they argue that his affidavit demonstrates further detail on certain points, sometimes as the result of resolving confusion in his deposition testimony or memory of events, refreshing his memory, or obtaining further information since his deposition testimony. They also disagree with McCullough's characterization of any part

of Anderson's affidavit as lacking "personal knowledge." They also contend that all of Anderson's averments in his affidavit are adequately supported by other record evidence. They then respond to McCullough's paragraph-by-paragraph challenges.

As to Mike Langer's affidavit, McCullough contends that the plaintiffs never disclosed in response to pertinent discovery requests that Mike Langer was expected to be a witness and/or that he had any knowledge concerning any of their allegations in this matter. McCullough points out that the plaintiffs have never supplemented the pertinent discovery response to identify Langer as a witness or person with pertinent information. McCullough also contends that the deadline for discovery in this matter passed on June 1, 2003, such that he is prejudiced by belated injection of Langer's affidavit. McCullough requests sanctions pursuant to Rule 37(a) and (b) of the Federal Rules of Civil Procedure for the plaintiffs' failure to disclose Langer, including striking Langer's affidavit and awarding McCullough the fees and costs he incurred in bringing his motion to strike.

CSIS and CPI admit that Langer was not disclosed as a potential witness in response to McCullough's interrogatory requesting such information. However, they contend that barring an undisclosed witness is seldom appropriate in the absence of "bad faith," which can't be shown here. Rather, they contend that McCullough had adequate notice of Langer's knowledge of facts pertinent to the case, from working with him at CSIS and CPI, and because McCullough himself raised in his own deposition the issues to which Langer avers. Similarly, they contend that, in his deposition, Anderson identified Langer as a person with knowledge on pertinent matters.

More generally, McCullough contends that he is entitled to reasonable expenses and attorney fees incurred due to the filing of the affidavits of Anderson and Langer pursuant to Rule 56(g) of the Federal Rules of Civil Procedure, on the ground that the affidavits were filed in bad faith. The plaintiffs suggest that no such general sanctions should be imposed, because neither affidavit was filed in bad faith.

### B. Analysis

#### 1. Anderson's affidavit

As mentioned above, McCullough's challenges to portions of Anderson's affidavit are based on failure to comply with the requirements of Rule 56(e) of the Federal Rules of Civil Procedure and/or contradiction of prior deposition testimony. The court will consider, first, the standards applicable to each kind of challenge.

#### a. Rule 56(e) requirements

As this court recently explained,

Rule 56(e) of the Federal Rules of Civil Procedure provides that an affidavit in support of a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." FED. R. CIV. P. 56(e). Because affidavits proffered in support of a motion for summary judgment must be based upon personal knowledge, an affidavit based upon "information and belief" is insufficient as a matter of law. *Automatic Radio Mfg. Co. v. Hazeltine Research*, 339 U.S. 827, 831, 70 S.Ct. 894, 94 L.Ed. 1312 (1950) (affidavit in support of motion for summary judgment made on information and belief does not comport with Rule 56(e)); *accord Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639 (2d Cir.1988); *Tavery v. United States*, 32 F.3d 1423, 1426 n. 4 (10th Cir.1994). Furthermore, the court may consider only that evidence that

would be admissible at trial. *Samuels v. Doctors Hosp., Inc.,* 588 F.2d 485, 486 n. 2 (5th Cir.1979). Hearsay statements which cannot be categorized as a hearsay exception, conclusory allegations, legal arguments, and statements not based upon personal knowledge, may be stricken. *See Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir.1988) (lack of personal knowledge); *Kamen v. American Tel. & Tel. Co.,* 791 F.2d 1006, 1011 (2d Cir.1986) (conclusory allegations and legal arguments).

With respect to [the requirements of Rule 56(e),] [c]ourts have recognized that "conclusory allegations and self-serving affidavits, without support in the record, do not create a triable issue of fact." *Hall v. Bodine Elec. Co.,* 276 F.3d 345, 354 (7th Cir.2002) (citing *Patterson v. Chicago Ass'n for Retarded Citizens,* 150 F.3d 719, 724 (7th Cir. 1998)); *accord Albiero v. City of Kankakee,* 246 F.3d 927, 933 (7th Cir.2001); *see Drake v. Minnesota Mining & Mfg. Co.,* 134 F.3d 878, 887 (7th Cir.1998); *Murray v. City of Sapulpa,* 45 F.3d 1417, 1422 (10th Cir.1995); *Slowiak v. Land O'Lakes, Inc.,* 987 F.2d 1293, 1295 (7th Cir.1993).

*Wells Dairy, Inc. v. Travelers Indemnity Co. of Illinois,* 241 F.Supp.2d 945, 956–57 (N.D.Iowa 2003); *see also Helm Fin. Corp. v. Iowa Northern Ry. Co.,* 214 F.Supp.2d 934, 952–54 (N.D.Iowa 2002) (stating similar standards).

### b. Contradiction of prior testimony

This court has also considered the standards applicable to alleged contradiction of prior deposition testimony by an affidavit offered in resistance to summary judgment:

As to contradiction of prior testimony, the Eighth Circuit Court of Appeals recently reiterated the following principles:

It is well-settled that "[p]arties to a motion for summary judgment cannot create sham issues of fact in an effort to defeat summary judgment." *American Airlines, Inc. v. KLM Royal Dutch Airlines, Inc.,* 114 F.3d 108, 111 (8th Cir.1997). Consequently,

a party should not be allowed to create issues of credibility by contradicting his own earlier testimony. Ambiguities and even conflicts in a deponent's testimony are generally matters for the jury to sort out, but a district court may grant summary judgment where a party's sudden and unexplained revision of testimony creates an issue of fact where none existed before. Otherwise, any party could head off a summary judgment motion by supplanting previous depositions ad hoc with a new affidavit, and no case would ever be appropriate for summary judgment.

*Wilson v. Westinghouse Elec. Corp.,* 838 F.2d 286, 289 (8th Cir.1988) (internal citations and quotation marks omitted).

*Bass v. City of Sioux Falls,* 232 F.3d 615, 619 (8th Cir.1999); *accord Dotson v. Delta Consolidated Indus., Inc.,* 251 F.3d 780, 781 (8th Cir.2001) ("We have held many times that a party may not create a question of material fact, and thus forestall summary judgment, by submitting an affidavit contradicting his own sworn statements in a deposition. *See, e.g., American Airlines, Inc. v. KLM Royal Dutch Airlines, Inc.,* 114 F.3d 108, 111 (8th Cir.1997), and *Camfield Tires, Inc. v. Michelin Tire Corp.,* 719 F.2d 1361, 1364–65 (8th Cir.1983)."); *Plymouth Foam Prods., Inc. v. City of Becker,* 120 F.3d 153, 155 n. 3 (8th Cir. 1997) (to the extent that the affiant's affidavit conflicts with his earlier deposition testimony, his affidavit testimony should be disregarded); *RSBI Aero-*

space, Inc. v. Affiliated FM Ins. Co., 49 F.3d 399, 402 (8th Cir.1995) (same). The Eighth Circuit Court of Appeals has explained that the rule that a party cannot create a "sham" issue of fact in an effort to defeat summary judgment by filing an affidavit directly contradicting prior deposition testimony "is a sound one," because "if testimony under oath could be 'abandoned many months later by the filing of an affidavit, probably no cases would be appropriate for summary judgment.'" *Herring v. Canada Life Assur. Co.*, 207 F.3d 1026, 1030 (8th Cir.2000) (quoting *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1366 (8th Cir.1983)).

However, the Eighth Circuit Court of Appeals has also explained that, where the affidavit testimony seems consistent with the affiant's prior deposition testimony, or simply adds more detailed information, the court may properly consider the affidavit on summary judgment. *Bass*, 232 F.3d at 619. Similarly, the court has recognized "that there are 'narrow circumstances' in which a subsequent affidavit is appropriate, such as to explain certain aspects of the deposition testimony or where the prior testimony reflects confusion on the part of the witness." *Herring*, 207 F.3d at 1030–31 (citing *Camfield Tires, Inc.*, 719 F.2d at 1364–65). In such circumstances, "it would be for the jury to resolve the discrepancy in the deposition testimony and the affidavit." *Id.* at 1031.

*Helm Fin. Corp.*, 214 F.Supp.2d at 954–55.

### c. *Specific paragraphs of the affidavit*

■ McCullough's challenges to specific paragraphs of Anderson's affidavit begin with paragraph 3. That paragraph states the following:

As a part of the purchase [of CPI by CSIS], Central States Industrial Supply,

Inc. and CPI Sales, Inc. negotiated an Employment Agreement with Steve McCullough sending several drafts back and forth. I was directly involved in this process.

Anderson Affidavit at ¶ 3. McCullough contends that the statement that "several drafts" were exchanged is contrary to Anderson's deposition testimony, in which Anderson responded to a question about who prepared the Employment Agreement by stating that "my guess would have been Bob Guinan [CSIS's corporate attorney] working with us." Defendant's Appendix at 31, Anderson Deposition at 38. The plaintiffs contend that there is no contradiction between Anderson's deposition testimony and his affidavit on this point, merely clarification.

Assuming, for the sake of argument, that this paragraph actually creates an issue of fact of significance to the disposition of McCullough's motion for summary judgment, the court is not convinced that this paragraph of Anderson's affidavit is plainly contrary to Anderson's prior deposition testimony that he "guess[ed]" that CSIS's corporate attorney prepared the Employment Agreement. Rather, this paragraph of Anderson's affidavit simply adds more detailed information concerning the negotiation of the Employment Agreement. *See Helm Fin. Corp.*, 214 F.Supp.2d at 955 (where the affidavit testimony simply adds more detailed information, the court may properly consider the affidavit on summary judgment). Moreover, the court finds that this is a situation where any ambiguities or even conflicts between Anderson's deposition testimony and this paragraph of his affidavit should be left to the jury to sort out. *Id.* The court will not strike paragraph 3 of Anderson's affidavit.

■ Next, McCullough challenges paragraph 4 of Anderson's affidavit, which states, "As part of the Employment Agree-

ment, Steve McCullough's salary increased from $65,000 to $75,000, plus a bonus plan which was not part of his previous wage package." Plaintiffs' Appendix, Exhibit 1, Anderson Affidavit at ¶ 4. McCullough also contends that this portion of the affidavit is contrary to Anderson's deposition testimony that he did not remember what McCullough's salary was either before or after the Employment Agreement and that he did not know of anything that McCullough gave in exchange for entering into the Employment Agreement. *See* Defendant's Appendix at 30–31, Anderson Deposition at 36–40. Taking the latter point first, this paragraph of Anderson's affidavit does not address whether or not McCullough gave anything in exchange for the Employment Agreement, only what CSIS and CPI gave, so that it plainly is not contrary to Anderson's deposition testimony that he did not know of anything that McCullough gave CSIS or CPI in order to enter into the Employment Agreement. *Compare* Anderson Affidavit at ¶ 4 *with* Anderson Deposition at 40. Nor is the court convinced that there is a true conflict between Anderson's specification in his affidavit of McCullough's salary before and after the parties entered into the Employment Agreement and his deposition testimony that he did not remember what McCullough's salary was before and after CSIS acquired CPI, or even whether or not McCullough's salary increased. It might have been wise, for purposes of enhancing his credibility, for Anderson to explain in his affidavit how it is that he now knows the dollar amounts of McCullough's salary before and after the acquisi-

tion, but did not know those amounts, or even whether McCullough's salary was more or less after the acquisition, at the time of his deposition. The plaintiffs attempt to explain that point now, in their brief in resistance to the motion to strike, by asserting that since his deposition, Anderson has verified certain points on which he expressed lack of memory in his deposition. The court concludes that Anderson's deposition testimony reflects confusion—or at least lack of memory—about the matters specifically stated in this paragraph of his affidavit, so that this portion of the affidavit falls within the exceptional circumstances in which a later affidavit may be appropriate. *See Helm Fin. Corp.*, 214 F.Supp.2d at 955. Moreover, the court finds that this paragraph of Anderson's affidavit simply adds more detailed information concerning the negotiation of the Employment Agreement. *See Helm Fin. Corp.*, 214 F.Supp.2d at 955 (where the affidavit testimony simply adds more detailed information, the court may properly consider the affidavit on summary judgment). Therefore, this paragraph of Anderson's affidavit will not be stricken, either.

▮ McCullough challenges paragraphs 5 and 7 of Anderson's affidavit, arguing that, in those paragraphs, Anderson attempts to characterize the plaintiffs' intent at the time of entering into the 1998 Employment Agreement and the 1999 Stock Repurchase Agreement—specifically, their intent for the Employment Agreement to remain in effect and to recognize that McCullough's employment was "at-will." [3] However,

---

3. The paragraphs of the affidavit in question here state the following:

> 5. From the date Steve McCullough signed the Employment Agreement in January of 1998, Central States Industrial Supply, Inc. and CPI Sales, Inc. intended for that

Employment Agreement to remain in effect.

> \* \* \* \* \* \*

> 7. Central States Industrial Supply, Inc. and CPI Sales, Inc., neither agreed nor intended to agree to supercede or replace Steve McCullough's Employment Agreement with the Stock Repurchase Agree-

McCullough contends that, in his deposition testimony, Anderson agreed that the statement in the 1999 Stock Repurchase Agreement that McCullough "is not bound by any employment agreement" was true. Thus, McCullough again argues that there is a conflict between Anderson's prior deposition testimony and his affidavit. The plaintiffs contend that Anderson's actual deposition testimony, that he agreed that the Stock Repurchase Agreement says what it says, is by no means contradictory to his averments in his affidavit of what the parties *intended* by the language used in the Stock Repurchase Agreement. Again, the court is not convinced that there is a true conflict between the statements in the two contexts or that the affidavit does more than add more detail. *See Helm Fin. Corp.*, 214 F.Supp.2d at 955. McCullough also argues that Anderson's statements about the plaintiffs' intent in entering into contracts is inadmissible, where the contract language is unambiguous. The court will reserve that question until it addresses, below, whether or not the language of the 1999 Stock Repurchase Agreement—to the effect that McCullough "is not bound by any employment agreement"—is ambiguous. McCullough also argues that Anderson's assertions in paragraph 5 and 7 are not supported by sufficient facts for the court to determine whether they are based on Anderson's personal knowledge. The court concludes, however, that the statements are not so plainly outside of Anderson's personal knowledge that they must be stricken; rather, a jury should decide what weight to give these statements of the plaintiffs' intent, if indeed the parties' intent becomes a triable issue. Finally, McCullough contends that these paragraphs contain Anderson's attempts to characterize what *McCullough* knew and understood, which plainly falls outside of *Anderson's* personal knowledge. The court disagrees, to the extent that the statements actually indicate *what Anderson believed that McCullough understood*, which goes to Anderson's state of mind, not McCullough's, so that the statements may be relevant to the parties' understanding of whether or not they had an agreement and whether or not there was a meeting of the minds.

■ McCullough's next challenge, which is to paragraph 8 of Anderson's affidavit, goes to the "personal knowledge" requirement of Rule 56(e) rather than contradiction of prior testimony. McCullough argues that Anderson's statement in this paragraph of his affidavit that McCullough and Nielsen were "actively seeking to purchase Fluid Technology" is not based on personal knowledge, where Anderson's deposition testimony shows that his only knowledge that McCullough and Nielsen ever talked to the owner of Fluid Technology came from McCullough's answer to an interrogatory. The plaintiffs assert, however, that Anderson does have independent, personal knowledge that McCullough and Nielsen were attempting to purchase Fluid Technology. This paragraph of the affidavit may not comply with the "personal knowledge" requirement of Rule 56(e), *see* FED. R. CIV. P. 56(e); *Wells Dairy, Inc.*, 241 F.Supp.2d at 956, but it is not the only basis for the purported issue of fact regarding McCullough's and Nielsen's purported attempts to purchase Fluid Technology of Des Moines, Iowa. Rather, the plaintiffs also rely on McCullough's and

---

ment. It was important, however, to make clear that Steve McCullough kept the right to terminate the employment relationship, as did Central States Industrial Supply, Inc. and CPI Sales, Inc. It is

my belief that Steve McCullough knew and understood that at the time the Stock Repurchase agreement was signed.
Anderson Affidavit at ¶¶ 5 & 7.

Nielsen's own deposition testimony regarding the purported attempt to purchase Fluid Technology. *See* Plaintiffs' Statement of Additional Facts (docket no. 28) at ¶ 7. The extent to which Anderson's affidavit may overstate the record regarding McCullough's and Nielsen's contact with the owner of Fluid Technology is a matter for a jury to consider. Therefore, the court concludes that this paragraph of the affidavit need not be stricken.

 Next, McCullough asserts that the court should strike paragraph 9 of Anderson's affidavit, which discusses McCullough's alleged taking of a corporate opportunity of CSIS and CPI to acquire Lincoln Supply.[4] McCullough contends that Anderson's deposition contains no mention of Lincoln Supply, even though he was repeatedly asked for information supporting the allegations contained in the plaintiffs' Complaint. McCullough also contends that Anderson cites no facts showing his personal knowledge of why McCullough counseled against CSIS and CPI pursuing acquisition of Lincoln Supply. To the extent that McCullough asserts a "contradiction" issue with regard to this portion of Anderson's affidavit, the court finds none. Rather, the affidavit merely adds more detail to testimony in the deposition by adding additional allegations. *See Helm Fin. Corp.*, 214 F.Supp.2d at 955. The court will consider below whether allegations regarding McCullough's advice about the purchase of Lincoln Supply come within the ambit of any of the wrongdoing alleged in the plaintiffs' Complaint. However, if the statement is pertinent, the court agrees with CSIS and CPI that Anderson has sufficient personal knowledge of what reasons McCullough gave for counseling against the acquisition of Lincoln Supply, although his speculation and conclusory opinion about *why* McCullough gave that advice cannot generate any genuine issue of material fact on that point. *Wells Dairy, Inc.*, 241 F.Supp.2d at 956–57. To that extent, paragraph 9 of Anderson's affidavit will be disregarded.

McCullough also contends that paragraphs 10 through 12 and 14 of Anderson's affidavit are not based on Anderson's personal knowledge, but consist of repetitions and misstatements of McCullough's testimony. To the extent that these paragraphs do not reflect Anderson's personal knowledge—which the court finds is the case in parts of paragraphs 10 and 14 and the entirety of paragraphs 11 and 12—they must be disregarded. *See* FED. R. CIV. P. 56(e); *Wells Dairy, Inc.*, 241 F.Supp.2d at 956–57. However, the court acknowledges the truth of CSIS's and CPI's observation that Anderson could not respond to McCullough's statements without identifying what those statements were. Moreover, to the extent that Anderson opines in paragraph 10 that the

---

4. Paragraph 9 of Anderson's affidavit states the following:

 9. During the same period, [CSIS] was approached by Waukesha to pursue an acquisition of their Minnesota distributor and integrator, Lincoln Supply. Dick Stenger and I asked Steve McCullough for his advice on whether [CSIS] and [CPI] should pursue that opportunity. Steve McCullough suggested that we turn down the opportunity, claiming it was his strong feeling that it would not work for [CSIS] and [CPI] to be both a distributor and an integrator. Following Steve McCullough's advice, we ceased to talk with that owner. I know that Steve McCullough's company, Custom Fabricating and Repair d/b/a Fluid Solutions, is now serving in that dual role for Waukesha in Minnesota, Iowa, and Nebraska. I believe Steve McCullough counseled against [CSIS] and [CPI] taking that corporate opportunity so that he could later take it for himself, which he did.

 Anderson Affidavit at ¶ 9.

information copied by McCullough had significant economic value to a competitor and would normally require cost, time, and effort to duplicate, the opinion may be sufficiently based on Anderson's personal knowledge to be admissible, although it may also be too conclusory to carry much weight with a jury without identification of supporting facts. Similarly, Anderson's contention in paragraph 14 that CSIS and/or CPI can and does provide certain services that McCullough had testified that they could not, may be admissible, although it is so conclusory that the court doubts that, standing alone, it could generate a genuine issue of material fact. However, the court need not decide those issues until and unless it determines that these paragraphs of Anderson's affidavit are the sole basis asserted for any genuine issue of material fact *on an issue pertinent the disposition of McCullough's motion for summary judgment.* Therefore, while the court will disregard paragraphs 11 and 12 in their entirety, the court will reserve until its legal analysis—and then only if necessary—consideration of whether paragraphs 10 and 14 must also be disregarded in their entirety.

 As his penultimate challenge in his motion to strike Anderson's affidavit, McCullough contends that paragraph 17 of Anderson's affidavit contradicts his deposition testimony, because it identifies alleged solicitations by McCullough of customers of CSIS and CPI that Anderson failed to mention in his deposition. However, as McCullough himself recognizes, Anderson's deposition testimony was that he could not recollect "at this time"— meaning, at the time of the deposition— any other incidents of violation of the non-compete provisions of McCullough's 1998 Employment Agreement other than the ones already mentioned in his deposition. *See* Anderson Deposition at 89–90. Thus, there is no "contradiction" of prior deposition testimony; there is, at worst, belated

disclosure of additional incidents not mentioned in the deposition at all. *See Helm Fin. Corp.,* 214 F.Supp.2d at 954–55. Again, the court will consider below the extent to which solicitation of customers of CSIS and CPI falls within the ambit of the claims asserted in the plaintiffs' Complaint.

■ Finally, as to Anderson's affidavit, McCullough contends that paragraphs 18 and 21 through 22 must be stricken, because they state only that Anderson has "direct knowledge" of certain situations, not "personal knowledge" of them, as required by Rule 56(e). Moreover, McCullough contends that these paragraphs identify no facts showing that Anderson has any personal knowledge of the allegations he makes. The court agrees that these paragraphs of Anderson's affidavit provide no factual basis to conclude that they are based on any "personal knowledge" of Anderson, and as such, are insufficient to generate any genuine issues of material fact, if indeed they are pertinent to any issue that the court finds potentially dispositive of McCullough's motion for summary judgment. *See* FED. R. CIV. P. 56(e); *Wells Dairy, Inc.,* 241 F.Supp.2d at 956–57.

Thus, McCullough's motion to strike Anderson's affidavit is granted in part and denied in part, as explained more specifically above. To the extent that the court has reserved ruling on portions of the motion to strike Anderson's affidavit, the motion will be mooted by the court's analysis of McCullough's motion for summary judgment.

### 2. *Langer's affidavit*

McCullough's challenge to Langer's affidavit is different in kind from his challenge to Anderson's affidavit. McCullough argues that Langer's affidavit should be stricken and sanctions imposed upon the

plaintiffs pursuant to Rule 37(a) and (b) of the Federal Rules of Civil Procedure, because Langer was not disclosed as a potential witness in this matter. As explained more fully above, the plaintiffs assert that any failure to disclose was not in bad faith and that, in any event, McCullough was fully aware of Langer and his knowledge of facts pertinent to this case.

As an initial matter, the court does not agree with McCullough that the pertinent provisions of Rule 37 in this context are paragraphs (a) and (b), at least not in the first instance. This is not a case in which McCullough has brought a motion to compel, the court has granted the motion, and the plaintiffs have failed to comply, which is the situation addressed in paragraphs (a) and (b) of Rule 37. *See generally Cooperative Fin. Ass'n, Inc. v. Garst,* 917 F.Supp. 1356, 1373–74 (N.D.Iowa 1996). Rather, the present context—failure to disclose a witness in response to a pertinent discovery request—is addressed in Rule 37(c)(1), which provides as follows:

> **(c) Failure to Disclose; False or Misleading Disclosure; Refusal to Admit.**
>
> (1) A party that without substantial justification fails to disclose information required by Rule 26(a) [methods of discovery, including 26(a)(5), authorizing discovery by interrogatories, etc.] or 26(e)(1) [duty to supplement responses], is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed. In addition to or in lieu of this sanction, the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions. In addition to requiring payment of reasonable expenses, including attorney's fees, caused by the failure, these sanctions may include any of the actions authorized under Rule 37(b)(2)(A), (B), and (C) and

> may include informing the jury of the failure to make the disclosure.

FED. R. CIV. P. 37(c)(1). This court "has wide latitude in imposing sanctions for failure to make discovery." *Garst,* 917 F.Supp. at 1374 (citing *Aziz v. Wright,* 34 F.3d 587, 589 (8th Cir.1994), *cert. denied,* 513 U.S. 1090, 115 S.Ct. 752, 130 L.Ed.2d 652 (1995)). "Furthermore, when the facts show willfulness and bad faith in the failure to permit discovery, the selection of a proper sanction is entrusted to the sound discretion of the district court." *Id.* (citing *Avionic Co. v. General Dynamics Corp.,* 957 F.2d 555, 558 (8th Cir.1992), in turn citing *National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 643, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976) (*per curiam*)).

The court agrees that Langer should have been disclosed in response to an interrogatory request for the identity of any witnesses or persons with knowledge of facts supporting the plaintiffs' claims and that the plaintiffs were under a duty to supplement their discovery responses when they became aware that Langer would either be a witness or had pertinent information. *See* FED. R. CIV. P. 26(a)(5) & (e)(1). The court could, therefore, strike Langer's affidavit, unless the failure to disclose is harmless. *See* FED. R. CIV. P. 37(c)(1) (if a witness has not been properly disclosed, "unless such failure is harmless," the party that failed to disclose the witness "is not ... permitted to use as evidence at a trial, at a hearing, or on a motion...."). Because the plaintiffs rely, to some extent, on Langer's affidavit in their attempts to generate genuine issues of material fact that preclude summary judgment, the court cannot find that the failure to disclose Langer was "harmless," unless the court determines below that, contrary to the plaintiffs' assertions in offering Langer's affidavit, Langer's affidavit simply

does not generate any necessary genuine issue of material fact, or that McCullough otherwise had adequate knowledge of Langer's evidence. However, "in lieu of this sanction" of striking Langer's affidavit, the court concludes that the "appropriate sanctions" here are the following: If the court finds that Langer's affidavit generates a genuine issue of material fact on an issue pertinent to McCullough's motion for summary judgment, the court will direct the plaintiffs to make Langer available for deposition prior to trial, at the plaintiffs' expense, including the defendant's *reasonable* attorney's fees for taking the deposition. *See* FED. R. CIV. P. 37(c)(1).

### 3. McCullough's request for sanctions

More generally, McCullough prays that the court sanction the plaintiffs by imposing upon them the costs and attorney's fees incurred in bringing his motion to strike affidavits, because he contends that the affidavits were presented in "bad faith." Because the court has declined to strike most of the challenged portions of Anderson's affidavit, the court cannot find that the plaintiffs acted in "bad faith" in offering his affidavit, so that no sanctions are appropriate as to his affidavit. The court also concludes that the sanctions stated above concerning Langer's affidavit are sufficient: If the failure to disclose Langer as a witness is not "harmless," because it does generate a genuine issue of material fact on a pertinent issue, then the plaintiffs will be required to make Langer available for deposition at the plaintiffs' expense.

### 4. Alternative analysis

▆▆▆ Even if the court's analysis of portions of McCullough's motion to strike is flawed—for example, with regard to certain paragraphs of Anderson's and Langer's affidavits—the court's disposition of McCullough's motion for summary judgment will necessarily moot his motion to

strike. This is so, because either (1) the court's analysis of the motion for summary judgment will necessarily determine whether any portions of Anderson's or Langer's affidavits generate genuine issues of material fact *on issues pertinent to the summary judgment motion,* based on the requirements of Rule 56(e), or (2) the summary judgment motion will be resolved without consideration of challenged portions of Anderson's or Langer's affidavits, such that portions of the motion to strike will be mooted *sub silentio.* Therefore, in the alternative, the court will deny McCullough's motion to strike in its entirety as mooted by the court's disposition of his motion for summary judgment.

The preliminary issue of whether or not Anderson's and Langer's affidavits should be stricken now being resolved or reserved, the court turns to disposition of McCullough's motion for summary judgment.

## III. THE MOTION FOR SUMMARY JUDGMENT*

### A. Standards For Summary Judgment

As this court has explained on a number of occasions, applying the standards of Rule 56 of the Federal Rules of Civil Procedure providing for summary judgment, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.,* 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.,* 906 F.2d 1234, 1237 (8th Cir.1990). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct.

1348, 89 L.Ed.2d 538 (1986); *Quick*, 90 F.3d at 1377 (same).

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir.1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *see also Rose–Maston v. NME Hosps., Inc.*, 133 F.3d 1104, 1107 (8th Cir.1998); *Reed v. Woodruff County, Ark.*, 7 F.3d 808, 810 (8th Cir. 1993). When a moving party has carried its burden under Rule 56(c), the party opposing summary judgment is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka ex. rel. United States v. Crane Co.*, 122 F.3d 559, 562 (8th Cir.1997), *cert. denied*, 523 U.S. 1040, 118 S.Ct. 1336, 140 L.Ed.2d 498 (1998); *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 511 (8th Cir.1995); *Beyerbach v. Sears*, 49 F.3d 1324, 1325 (8th Cir.1995). An issue of material fact is "genuine" if it has a real basis in the record. *Hartnagel*, 953 F.2d at 394 (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 586–87, 106 S.Ct. 1348). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment," *i.e.*, are "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Beyerbach*, 49 F.3d at 1326; *Hartnagel*, 953 F.2d at 394.

If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548; *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir.1997). Ultimately, the necessary proof that the nonmoving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir.1994).

The court will apply these standards to McCullough's motion for summary judgment, considering each of the plaintiffs' claims in turn.

### B. The Breach–Of–Contract Claims

To prove a breach-of-contract claim under Iowa law, the plaintiffs must prove: (1) the existence of a contract between themselves and the defendant; (2) the terms and conditions of the contract; (3) that the plaintiffs performed all the terms and conditions required under the contract; (4) that the defendant breached the contract in some particular way; and (5) that the plaintiffs have suffered damages as a result of the breach. *See, e.g., Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998). The first element, existence of a contract, in turn, requires, among other things, proof that the parties had the capacity to contract and that there was consideration for the contract. *See Magnusson Agency v. Public Entity Nat'l Company–Midwest*, 560 N.W.2d 20, 25 (Iowa 1997) (listing "capacity to contract," "existence of a contract," and "consideration" as separate elements of a breach-of-contract claim, but describing both "capacity to contract" and "consideration" as "essential elements" of a binding contract).

CSIS and CPI contend that McCullough breached paragraph 5 of the 1998 Employment Agreement by removing and retaining certain confidential information (Count I) and by disclosing in his employment with Fluid Solutions confidential and proprietary information of CPI to which he had gained access and working knowledge during his employment with CPI (Count II). McCullough's first two challenges to both breach-of-contract claims are the same: (1) the 1998 Employment Agreement is not enforceable, because (a) Stenger did not have authority to enter into it, and (b) there was no consideration for the Agreement, and (2) even if the 1998 Employment Agreement was enforceable, that Agreement was superseded by the 1999 Stock Repurchase Agreement. If the 1998 Employment Agreement was enforceable and was not superseded, McCullough also contends that he did not, as a matter of law, breach the Agreement in either of the ways that CSIS and CPI allege that he did. CSIS and CPI contend that, at a minimum, there are genuine issues of material fact on each of McCullough's contentions.

### 1. Enforceability of the 1998 Employment Agreement

#### a. Arguments of the parties

McCullough argues that capacity to contract is one of the elements of a valid and enforceable contract, and as noted above, the court agrees. However, McCullough argues that, as a matter of law, the person who signed the 1998 Employment Agreement on behalf of CPI, Richard Stenger, did not have such capacity, because he was not the "Secretary/Treasurer" of CPI as he purported to be on January 5, 1998, when the contract was executed; indeed, McCullough argues that Stenger did not become the Secretary/Treasurer of CPI until his election to the board of directors for CPI on January 20, 1998. McCullough

argues that Harry Anderson, the other shareholder in CSIS besides Stenger at the time that CSIS acquired CPI, admitted in his deposition that Stenger executed the 1998 Employment Agreement prior to the time that Stenger actually became CPI's Secretary/Treasurer. McCullough also argues that consideration, another essential element of a binding contract, is lacking here, because he occupied the same position as president of CPI, with the same duties, before and after the execution of the 1998 Employment Agreement. In other words, he contends that he did not receive anything, either a return promise or any other benefit, in exchange for his execution of the 1998 Employment Agreement.

CSIS and CPI disagree. First, as to capacity to contract, they argue that only CPI had the power to avoid the contract on the basis that Stenger lacked capacity to contract on CPI's behalf. However, they argue that CPI has never questioned Stenger's actions in signing the 1998 Employment Agreement on CPI's behalf, and, indeed, that CPI has ratified Stenger's actions by adhering to the Agreement. CPI also argues, in a footnote, that McCullough cannot challenge the Agreement based on Stenger's supposed lack of capacity, because McCullough has accepted the benefits of the Agreement and has not offered to restore what he received pursuant to it. CSIS and CPI contend that McCullough's arguments about supposed lack of consideration for the 1998 Employment Agreement are also without merit. First, they contend that adequate consideration is presumed under Iowa law, because IOWA CODE § 537A.2 provides that "[a]ll contracts in writing, signed by the party to be bound or by the party's authorized agent or attorney, shall import a consideration." Furthermore, they contend that McCullough cannot rebut this presumption of adequate consideration, be-

cause continued employment alone provides sufficient consideration to support a written contract concerning employment terms. Here, they contend, McCullough received continued employment in exchange for signing the 1998 Employment Agreement. They also contend that there is further consideration, because McCullough also received explicit consideration for signing the 1998 Employment Agreement in the form of a $10,000 raise and a bonus schedule.

In reply, McCullough argues that, because Stenger did not have capacity to act on CPI's behalf, the contract is void and not capable of ratification. As to consideration, McCullough argues in his reply that there is no consideration in continued employment if he only made a promise to do that which he was already obligated to do.

### b. Stenger's capacity to contract on CPI's behalf

The court finds that there is no genuine issue of material fact that Stenger was not the Secretary/Treasurer of CPI on January 5, 1998, at the time that he purported to act in that capacity by entering into the 1998 Employment Agreement with McCullough on CPI's behalf. This is so, because, as McCullough points out, Stenger was not actually elected to the board of directors of CPI, and the acquisition of CPI by CSIS was not completed, until the shareholders meeting on January 20, 1998. *See* Defendant's Appendix at 54, Exhibit G (Minutes of Special Meeting of Shareholders of CPI, Inc., on January 20, 1998). The plaintiffs do not argue to the contrary. Rather, they argue that CPI's ratification of the 1998 Employment Agreement after January 20, 1998, and McCullough's failure to return the benefits of that Agreement, mean that McCullough, like CPI, is bound by the Agreement.

▆▆▆▆ "A fundamental principle of agency law is that whatever an agent does,

within the scope of his or her actual authority, binds the principal." *Magnusson Agency*, 560 N.W.2d at 25 (citing *Dillon v. City of Davenport*, 366 N.W.2d 918, 924 (Iowa 1985)). However, the agent's lack of authority to enter into an agreement does not necessarily make the agreement void. Rather, as the Iowa Supreme Court explained some time ago, what a party could previously have authorized, it can subsequently ratify. *See In re Johnson's Estate*, 210 Iowa 891, 232 N.W. 282, 286 (1930). In other words, "[r]atification operates upon the act ratified precisely as though authority to do the act had been previously given; and, when the principal has ratified the unauthorized agreement of an agent, an action may be brought upon the agreement as though originally made by due authority." *Id.; see also* RESTATEMENT (SECOND) OF AGENCY § 82 ("Ratification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him."). Although "[r]atification does not result from the affirmance of a transaction with a third person unless the one acting purported to be acting for the ratifier," RESTATEMENT (SECOND) OF AGENCY § 85(1), the record here shows beyond dispute that Stenger was, indeed, purporting to act for CPI as its Secretary/Treasurer when he entered into the 1998 Employment Agreement with McCullough. Thus, CPI could ratify Stenger's contract with McCullough, *binding CPI* to the contract. Furthermore, "[w]here a purported servant or other agent has entered into a transaction with a third person, its ratification by the purported master or other principal has the same effect upon the liabilities *of the third person to the principal* as an original authorization." RESTATEMENT (SECOND) OF AGENCY § 319 (emphasis added). Thus, CPI's subse-

quent ratification of Stenger's contract with McCullough *would also bind McCullough* to the contract.

 On the present record, there are at least genuine issues of material fact that CPI did ratify the 1998 Employment Agreement entered into on its behalf by Stenger, acting as CPI's purported agent, thus binding both CPI and McCullough to the contract. Those genuine issues of material fact arise from evidence that CPI continued to abide by the terms of the 1998 Employment Agreement after January 20, 1998. *See Hartnagel,* 953 F.2d at 394 (an issue of material fact is "genuine" if it has a real basis in the record). Thus, there are genuine issues of material fact as to whether both parties are bound by the 1998 Employment Agreement. *See In re Johnson's Estate,* 232 N.W. at 286; RESTATEMENT (SECOND) OF AGENCY §§ 82, 319. Even assuming, for the sake of argument, that McCullough might, in some circumstances, have been able to avoid the 1998 Employment Agreement on the basis of Stenger's supposed lack of capacity to act on CPI's behalf, there are also genuine issues of material fact that he has lost the power to avoid the contract by affirmance. *See* RESTATEMENT (SECOND) OF CONTRACTS § 380 ("The power of a party to avoid a contract for incapacity ... is lost if, after the circumstances that made the contract voidable have ceased to exist, he manifests to the other party his intention to affirm it or acts with respect to anything that he has received in a manner inconsistent with disaffirmance."). This is so, because there are also genuine issues of material fact that McCullough continued to abide by the terms of the 1998 Employment Agreement after January 20, 1998, and there is no showing that he ever returned any of the salary or benefits he obtained pursuant to that contract. Therefore, McCullough is not entitled to summary judgment on the plaintiffs' breach-of-contract claims on the

ground that Stenger lacked capacity to act on CPI's behalf.

### c. Adequacy of consideration

 McCullough also seeks summary judgment on the plaintiffs' breach-of-contract claims on the ground that there was no "consideration" for the 1998 Employment Agreement. The Iowa Supreme Court recently explained the requirement of "consideration" for a contract as follows:

> Another essential element of any binding contract is consideration. *Dullard v. Schafer,* 251 Iowa 274, 281, 100 N.W.2d 422, 427 (1960). Consideration constitutes either a benefit to the promisor or a detriment to the promisee. *In re Marriage of Farr,* 542 N.W.2d 828, 832 (Iowa 1996). Consideration may consist of a performance or a return promise, and it must be "bargained for." *Id.; Restatement (Second) of Contracts* § 71(1). Any performance which is bargained for is consideration. *Restatement (Second) of Contracts* § 72. A performance is bargained for if it is sought by the promisor in exchange for his or her promise and is given by the promisee in exchange for that promise. *Id.* § 71(2).

*Magnusson Agency,* 560 N.W.2d at 26–27. As the plaintiffs here point out, IOWA CODE § 537A.2 states that "All contracts in writing, signed by the party to be bound or by the party's authorized agent or attorney, shall import a consideration." Some time ago, the Iowa Supreme Court held that this provision "cast[s] on the one who pleads lack of consideration the burden of establishing his defense." *DePenning v. Bedell,* 242 Iowa 102, 44 N.W.2d 385, 388 (1950). Similarly, IOWA CODE § 537A.3 states, "The want or failure, in whole or in part, of the consideration of a written contract may be shown as a defense, total or partial. ..." Thus, the ultimate burden is

on McCullough to establish lack of consideration, even though the burden at summary judgment is on CSIS and CPI, as the nonmovants, to generate a genuine issue of material fact that there was consideration for the 1998 Employment Agreement.

■ CSIS and CPI argue that there are genuine issues of material fact that there was adequate consideration for the 1998 Employment Agreement in at least two respects: (1) continued employment was bargained for; and (2) the 1998 Employment Agreement involved an increase in salary and bonus benefits for McCullough as compared to his prior employment. This court has held that, under Iowa law, continued employment is consideration that will support a contract. *See Owen v. MBPXL Corp.*, 173 F.Supp.2d 905, 914 (N.D.Iowa 2001) (citing *French v. Foods, Inc.*, 495 N.W.2d 768, 770 (Iowa 1993) (continued working provides consideration for a contract created by an employee handbook); *Fogel v. Trustees of Iowa College*, 446 N.W.2d 451, 455 (Iowa 1989) (same); *McBride v. City of Sioux City*, 444 N.W.2d 85, 91 (Iowa 1989) (same)); *see also Phone Connection, Inc. v. Harbst*, 494 N.W.2d 445, 449 (Iowa Ct. App.1992) (continued employment for an indefinite period of time provides sufficient consideration for a covenant not to compete). Moreover, on the record presented here, there is at least a genuine issue of material fact that the parties entered into the 1998 Employment Agreement precisely to continue McCullough's employment after CSIS acquired CPI and the terms of the Agreement involved promises and performance to secure such employment. *See, e.g.*, 1998 Employment Agreement, Recitals (stating that the parties entered into the contract because of CPI's desire to continue McCullough's employment after CPI's acquisition by CSIS and McCullough's desire to continue such employment). McCullough's contention that continued employment will not suffice

as consideration because he only promised in the 1998 Employment Agreement to do what he was already obligated to do is without merit. McCullough was an "at-will" employee; thus, he was under no obligation to continue his employment with CPI after its acquisition by CSIS in the absence of the 1998 Employment Agreement. In these circumstances, McCullough's agreement to continued employment was, indeed, adequate consideration for the Agreement.

■ McCullough also does not dispute that the 1998 Employment Agreement increased his salary and changed his bonus schedule—although he did dispute the admissibility of the portions of Anderson's affidavit that discuss the salary increase, a contention that the court rejected above—and such a salary increase and change in benefits clearly were benefits to him and detriments to CPI, so that they constituted adequate consideration. *See Magnusson Agency*, 560 N.W.2d at 27. Finally, where, as here, the party challenging the contract has retained all of the benefits that he received under the agreement, the court generally will not inquire further into the adequacy of the consideration given. *See, e.g., Kristerin Dev. Co. v. Granson Inv.*, 394 N.W.2d 325, 331–32 (Iowa 1986). McCullough is not entitled to summary judgment on the plaintiffs' breach-of-contract claims on the ground that the 1998 Employment Agreement was not supported by consideration.

### 2. Was the 1998 Employment Agreement superseded?

#### a. Arguments of the parties

McCullough next contends that it is undisputed—or indisputable—that the 1998 Employment Agreement was superseded by the parties' execution on October 5, 1999, of the Stock Repurchase Agreement, so that the 1998 Employment Agreement

cannot be enforced against him. McCullough specifically relies on a recitation in the 1999 Stock Repurchase Agreement that "McCullough ... *is not bound by any employment agreement....*" Stock Repurchase Agreement at ¶ 4(b) (emphasis added). McCullough contends that this language unambiguously indicates that the 1998 Employment Agreement was superseded by the 1999 Stock Repurchase Agreement. McCullough apparently contends that the subsequent Addendum to the Stock Repurchase Agreement reiterates that the Stock Repurchase Agreement superseded the 1998 Employment Agreement.

On the other hand, CSIS and CPI contend that the language in the 1999 Stock Repurchase Agreement upon which McCullough relies means no more than that McCullough's employment continued to be "at-will"; they assert that the provision McCullough cites was not intended to abrogate or supersede any of the provisions of the 1998 Employment Agreement, nor did the parties behave as if it had. Rather, CSIS and CPI contend that the subject of the 1999 Stock Repurchase Agreement was the terms of an agreement for the issuance to and repurchase from McCullough of CPI stock, not the terms of his employment more generally. For example, they point out that other terms of McCullough's employment, such as compensation and bonuses, otherwise continued to be controlled by the 1998 Employment Agreement.

In reply, McCullough contends that the plaintiffs have improperly looked beyond the unambiguous language of the 1999 Stock Repurchase Agreement to parole evidence in an attempt to generate a genuine issue of material fact that the 1999 Stock Repurchase Agreement did not supersede the 1998 Employment Agreement or is ambiguous. He argues that, looking only at the terms of the 1999 Stock Repurchase Agreement, only his interpretation gives meaning to all of the terms of that Agreement, and in particular, to the language upon which he relies.

### b. Effect of the 1999 Stock Repurchase Agreement and Addendum

**■ i. Rules of interpretation and construction.** This court has recognized that Iowa law distinguishes between "interpretation" and "construction" of a contract. *See Kaydon Acquisition Corp. v. America Central Indus., Inc.,* 179 F.Supp.2d 1022, 1037 (N.D.Iowa 2001). When the dispute concerns the meaning of certain contract terms, the court must engage in the process of interpretation, rather than construction. *See id.* (citing *Walsh v. Nelson,* 622 N.W.2d 499, 503 (Iowa 2001); *Fausel v. JRJ Enters., Inc.,* 603 N.W.2d 612, 618 (Iowa 1999), which notes that interpretation is "a process for determining the meaning of words in a contract" while construction is "a process of determining the legal effect of such words"; and *Fashion Fabrics of Iowa v. Retail Investors Corp.,* 266 N.W.2d 22, 25 (Iowa 1978), which states, "Interpretation involves ascertaining the meaning of contractual words; construction refers to deciding their legal effect."). As this court has noted,

> The Iowa Supreme Court has explained that:
>
> > The primary goal of contract interpretation is to determine the parties' intentions at the time they executed the contract. *See Hartig Drug Co. [v. Hartig],* 602 N.W.2d [794,] 797 [(Iowa 1999)]. Interpretation involves a two-step process. First, from the words chosen, a court must determine "what meanings are reasonably possible." *Restatement (Second) of Contracts* § 202 cmt. a, at 87 (1981). In so doing, the court determines whether a

disputed term is ambiguous. A term is not ambiguous merely because the parties disagree about its meaning. *Hartig Drug Co.*, 602 N.W.2d at 797. A term is ambiguous if, "after all pertinent rules of interpretation have been considered," "a genuine uncertainty exists concerning which of two reasonable interpretations is proper." *Id.*

Once an ambiguity is identified, the court must then "choos[e] among possible meanings." *Restatement (Second) of Contracts* § 202 cmt. a, at 87. If the resolution of ambiguous language involves extrinsic evidence, a question of interpretation arises which is reserved for the trier of fact. *Fausel*, 603 N.W.2d at 618.

*Walsh*, 622 N.W.2d at 503.

*Kaydon Acquisition Corp.*, 179 F.Supp.2d at 1037–38. As to "pertinent rules of interpretation," the Iowa Supreme Court has explained that "We ... do not interpret [any] contractual term apart from the context of the agreement as a whole.... The parties' intent as evidenced by all of the terms of the contract controls our conclusion." *Koenigs v. Mitchell County Bd. of Supervisors*, 659 N.W.2d 589, 594 (Iowa 2003). "Interpretation" is "a question of law for the court unless the meaning of disputed terms turns on extrinsic facts or choices among reasonable inferences." *Grinnell Select Ins. Co. v. Continental Western Ins. Co.*, 639 N.W.2d 31, 33 (Iowa 2002).

■ On the other hand, where the dispute centers on determining the legal effect of contractual terms, the court engages in the process of construction, rather than interpretation. *See Fausel*, 603 N.W.2d at 618; *Fashion Fabrics of Iowa*, 266 N.W.2d at 25. "In the construction of written contracts, the cardinal principle is that the intent of the parties must control; and except in cases of ambiguity,

this is determined by what the contract itself says." Iowa R. App. P. 6.14(6)(n). The Iowa Supreme Court has explained that "construction" is "always a question of law." *See Grinnell Select Ins. Co.*, 639 N.W.2d at 33.

■ *ii. Interpretation and construction of the pertinent terms.* As to the proper "interpretation" of paragraph 4(b) of the 1999 Stock Repurchase Agreement, the court must first determine the meaning of the words in the contract. *See Kaydon Acquisition Corp.*, 179 F.Supp.2d at 1037. Again, the paragraph in question states the following:

> The parties hereto understand and agree that Steve McCullough may leave the Corporation at any time *and is not bound by any employment agreement,* and that upon doing so, he must sell and the Corporation must buy his stock under the conditions set forth above.

Stock Repurchase Agreement ¶ 4(b) (emphasis added). From the words chosen, the court agrees that a reasonably possible meaning *of the italicized phrase standing alone* may be that the parties intended to supersede the 1998 Employment Agreement, as McCullough contends. *See Kaydon Acquisition Corp.*, 179 F.Supp.2d at 1037 (process of interpretation consists, first, of determining from the words chosen what meanings are reasonably possible). However, the court does not examine that phrase in isolation; rather, the court "do[es] not interpret [any] contractual terms apart from the context of the agreement as a whole" and "[t]he parties' intent as evidenced by all of the terms of the contract controls [the court's] conclusion." *Koenigs*, 659 N.W.2d at 594. Reading the italicized phrase in the context of the entire paragraph, it becomes apparent that a more reasonable—indeed, to the court's mind, the *only* reasonable—meaning is that this paragraph states no

more than that McCullough's employment is "at-will," as the plaintiffs contend. The italicized phrase does not stand alone, but instead clarifies the preceding phrase, which states that "McCullough may leave the Corporation at any time." Stock Repurchase Agreement ¶ 4(b). In short, the meaning of the *entire paragraph* is that McCullough may leave his employment with CSIS and CPI at any time and no employment agreement stands in the way of his "at-will" departure.

Moreover, in the context of the entire 1999 Stock Repurchase Agreement, *see Koenigs*, 659 N.W.2d at 594 (the court "do[es] not interpret [any] contractual terms apart from the context of the agreement as a whole"), it is absurd to read the phrase on which McCullough relies as stating an intent to supersede any prior employment agreement. The 1999 Stock Repurchase Agreement concerns *only* the terms under which stock is conveyed to McCullough and must be resold by him and repurchased by the company; it does not purport to state the terms of McCullough's employment more generally. The Addendum to the Stock Repurchase Agreement is not to the contrary.

Thus, examination of the entire paragraph in which the language upon which McCullough relies, and further examination of that paragraph in the context of the entire agreement, leads to the interpretation that the paragraph reiterates McCullough's "at-will" employment status. The parties' disagreement as to the meaning of the paragraph in question does not establish ambiguity where no ambiguity otherwise exists. *See Kaydon Acquisition Corp.*, 179 F.Supp.2d at 1037–38. Because there is no ambiguity, the court need not proceed to the second step in the process of "interpretation," which would require the court to chose among possible meanings, for example, on the basis of extrinsic evidence. *Id.*

Rather, the court turns next to "construction" of the contractual terms, which means the determination of their legal effect. *See Fausel*, 603 N.W.2d at 618. Although the parties' intent is once again controlling, where, as here, there is no ambiguity, intent "is determined by what the contract itself says." Iowa R. App. P. 6.14(6)(n). What the pertinent paragraph of the 1999 Stock Repurchase Agreement says is that McCullough's employment is "at-will," no more and no less. Thus, the "legal effect" of paragraph 4(b) of the 1999 Stock Repurchase Agreement is *not* to supersede the 1998 Employment Agreement, which the parties agree already provided for "at-will" employment. Consequently, McCullough's motion for summary judgment on the plaintiffs' breach-of-contract claims on the basis that the 1998 Employment Agreement has been superseded by the 1999 Stock Repurchase Agreement must be denied.

### 3. Did McCullough breach the 1998 Employment Agreement?

Because McCullough's motion for summary judgment on the breach-of-contract claims fails on the element of the existence of a contract, the court turns to McCullough's challenge to the "breach" element. *See, e.g., Molo Oil Co.*, 578 N.W.2d at 224 (to win their breach-of-contract claim, the plaintiffs must prove: (1) the existence of a contract between themselves and the defendant; (2) the terms and conditions of the contract; (3) that the plaintiffs performed all the terms and conditions required under the contract; (4) *that the defendant breached the contract in some particular way;* and (5) that the plaintiffs have suffered damages as a result of the breach) (emphasis added). As the Iowa Supreme Court has explained, "A breach of a contract is a party's failure, without legal excuse, to perform any promise which forms a whole or a part of the contract." *Magnusson Agency*, 560

N.W.2d at 27 (citing 17A AM.JUR.2D, *Contracts* § 716, at 727). Therefore, the court must consider next McCullough's contention that he did not, as a matter of law, fail to perform any promise that forms part of the 1998 Employment Agreement.

### a. Count I: Removal or retention of confidential information

***i. Arguments of the parties.*** McCullough contends that neither Anderson nor Stenger, the principals of CSIS and CPI, could point to any facts whatsoever in support of their allegations, in their first breach-of-contract claim in Count I, that McCullough removed or retained CPI's confidential business information and proprietary trade secrets. Rather, he contends that their allegations are based solely upon their assumptions and baseless conclusions. He also contends that none of the other employees of CSIS and CPI who were listed as potential witnesses offered any deposition testimony to support the plaintiffs' contention that McCullough breached his 1998 Employment Agreement in the manner alleged in Count I of the Complaint.

The plaintiffs, on the other hand, contend that there is a jury question presented on whether McCullough removed and retained confidential and trade secret information belonging to CPI. They contend that they are not required to produce a "smoking gun," but may instead rely on evidence from which a reasonable factfinder could conclude or infer that the former employee possessed the information and communicated it to another, citing *Teleconnect v. Ensrud*, 55 F.3d 357, 360 (8th Cir.1995). They contend that the necessary inferences to defeat summary judgment are presented here by uncontradicted evidence that, just days before presenting his letter of resignation, McCullough copied the entire CPI database.

The plaintiffs contend that Anderson's affidavit demonstrates that the information copied constituted proprietary and trade secret information. Even more powerful inferences arise, they contend, from McCullough's giving a copy of the downloaded information to Hull for use in a "side business," and McCullough's attempts to concoct a story with Hull to "cover" his copying and retention of the information. They contend that a jury could reasonably conclude that there was no legitimate business interest *of CPI* for McCullough to copy the information, so that it follows that a reasonable inference is that McCullough intended to use the information in his employment with his new employer. Finally, they contend that the fact that Anderson and CPI never received the second copy of the downloaded information, which McCullough asserted that he had mailed back to Anderson, suggests that McCullough actually retained the second copy of the downloaded information.

 ***ii. Analysis.*** First, the court finds that paragraph 5 of the 1998 Employment Agreement expressly prohibits McCullough from removing or retaining proprietary and trade secret information of CPI, so that the contract specifically imposes the duty that the plaintiffs contend that McCullough breached in Count I of their Complaint. Specifically, paragraph 5 of the 1998 Employment Agreement recites that McCullough acknowledges the proprietary nature of certain information, and that McCullough "agrees that in addition to not disclosing any of the [proprietary information], *he will not in any way use such proprietary information* during the contractual arrangement or thereafter, whether such arrangement terminates prior to the contract term or thereafter." 1998 Employment Agreement, ¶ 5 (emphasis added).[5] The prohibi-

---

**5.** This provision makes little sense, unless "in any way use such proprietary information"

tion on McCullough's "use" "in any way" of the proprietary information is plainly broad enough to prohibit McCullough's "removal" or "retention" of the proprietary information. Thus, the foundation for a breach-of-contract claim, identification of the defendant's "promise" in the contract, has been laid. *See Magnusson Agency,* 560 N.W.2d at 27 ("A breach of a contract is a party's failure, without legal excuse, to perform any promise which forms a whole or a part of the contract.").

 Further, as to breach of this provision in the manner alleged, McCullough does not dispute that he copied CPI's entire database, even if he disputes the precise manner in which he did so. Therefore, there is at least a genuine issue of material fact that he "removed" the proprietary information in violation of paragraph 5 of the 1998 Employment Agreement. The court also agrees that the evidence upon which the plaintiffs rely as suggesting that McCullough did not return all the copies of the downloaded information is sufficient to generate genuine issues of material fact that McCullough also "retained" CPI's proprietary information. *See Teleconnect Co. v. Ensrud,* 55 F.3d 357, 359–60 (8th Cir. 1995) (detailing evidence suggesting that the defendant "was privy to confidential information during his term of employment," and declining the defendant's invitation to "weigh the evidence" in light of his contrary representations, and expressly holding that "circumstantial evidence produced by [the plaintiff] is sufficient to meet [its] burden" in resistance to a motion for summary judgment; "no direct, first-hand evidence showing that confidences were conveyed" is required).

Therefore, McCullough is not entitled to summary judgment on Count I of the plaintiffs' Complaint on the ground that he did not, as a matter of law, breach paragraph 5 of the 1998 Employment Agreement by "removing and retaining" proprietary information.

### b. Count II: Disclosure of confidential matters

***i. Arguments of the parties.*** The parties' arguments regarding the merits of McCullough's motion for summary judgment on the second breach-of-contract claim, pertaining to disclosure of confidential information, are comparable to their arguments regarding the first breach-of-contract claim. McCullough again contends that the plaintiffs' allegations are based solely upon their assumptions and baseless conclusions. The plaintiffs again rely on inferences from evidence that McCullough had access to, and admits downloading, confidential information and that he retained a copy of that downloaded information or otherwise disclosed it in employment with his new employer. Somewhat more specifically, they contend that the circumstances of Fluid Solutions's subsequent conduct—such as obtaining distributor rights from CPI's and CSIS's suppliers and engaging in transactions with what had formerly been CPI and CSIS customers—suggest that McCullough has, indeed, disclosed and used CPI's confidential information.

***ii. Analysis.*** Again, the court finds that—if anything more explicitly—paragraph 5 of the 1998 Employment Agreement prohibits the conduct of "disclosure" alleged to be a breach of contract in Count II of the Complaint. That provision of the

---

means "for an unauthorized purpose," or the provision would appear to bar McCullough from using the information even for CPI's and CSIS's business. However, what uses might

be permitted is not really the issue either in CPI's and CSIS's Complaint or McCullough's motion for summary judgment.

Employment Agreement provides, in pertinent part, that McCullough "agrees that during and after the term of this Agreement, he will not disclose the list of those customers or manufacturing representative contracts or any part thereof to any firm, person, association or corporation or other entity for any reason or purpose whatsoever and will not during or after the term disclose any papers, records, programs, products or any other information relative to Employer's business." 1998 Employment Agreement, ¶ 5. Thus, the issue is whether McCullough breached this "promise," or at least, whether there are genuine issues of material fact that he did so. *See Magnusson Agency*, 560 N.W.2d at 27 ("A breach of a contract is a party's failure, without legal excuse, to perform any promise which forms a whole or a part of the contract.").

 Again, the court finds that the evidence to which the plaintiffs point is sufficient to generate genuine issues of material fact that McCullough not only removed and retained proprietary information of CPI, but that he subsequently "disclosed" it to Fluid Solutions. The fact that the evidence of "disclosure" again depends upon a chain of inferences is not fatal to the plaintiffs' claim. *See Teleconnect Co.*, 55 F.3d at 359–60. Therefore, McCullough also is not entitled to summary judgment on the plaintiffs' second breach-of-contract claim, in Count II of their Complaint, on the ground that he did not, as a matter of law, breach his contract in the manner alleged.

### C. The Trade Secrets Act Claim

Count III of the Complaint, denominated "Iowa Trade Secrets Act," alleges that, in the course of his employment with CPI, McCullough had access to and became intimately familiar with CPI's trade secrets, as defined by Iowa Code § 550.2(4), and that McCullough's taking of CPI's trade secrets and his employment with Fluid Solutions has resulted and will result in disclosure of CPI's trade secrets constituting "misappropriation" under Iowa Code § 550.2(3). *Id.*, Count III. The arguments and analysis pertaining to this claim are considerably more straight-forward than they were for the breach-of-contract claims.

#### 1. Arguments of the parties

McCullough contends that the plaintiffs cannot point to any "trade secrets" that he allegedly "misappropriated." Moreover, he contends that they have no evidence to support their allegations that he "misappropriated" any proprietary information or trade secrets, because neither Stenger nor Anderson nor any other potential witness identified any facts whatsoever to support their allegations that he misappropriated trade secrets.

The plaintiffs, obviously, disagree. They contend that there are jury questions regarding whether McCullough misappropriated trade secrets. First, they contend that courts have concluded that information similar to the information that McCullough downloaded constitutes "trade secrets" within the meaning of Iowa Code § 550.2(4). Further, they contend that the facts discussed in reference to their breach-of-contract claims also support reasonable inferences that McCullough acquired the information by improper means, specifically, copying company information, and disclosed that information improperly with knowledge that doing so was prohibited by his contract, thereby "misappropriating" trade secrets in violation of Iowa Code § 550.2(3)(a), (b), and (d).

In reply, McCullough asserts that the plaintiffs still have no evidence that supports a reasonable inference of misappropriation, because they have no statements or documents from his subsequent employ-

er suggesting that it obtained confidential information from McCullough. McCullough contends that there are no genuine issues of material fact that he *both* acquired and disclosed trade secrets. Specifically, he contends that the fact that his new employer does business with past CPI and CSIS customers does not give rise to an inference that McCullough used confidential information to assist his new employer in doing so.

### 2. Analysis

■■■ As this court explained in *Walker Manufacturing, Inc. v. Hoffmann, Inc.,* 261 F.Supp.2d 1054 (N.D.Iowa 2003), IOWA CODE CH. 550 is Iowa's version of the Uniform Trade Secrets Act. *Walker Mfg., Inc.,* 261 F.Supp.2d at 1079. Moreover, under the Iowa Trade Secrets Act, " '[t]here are three recognized prerequisites for relief based on the appropriation of a trade secret: (1) existence of a trade secret, (2) acquisition of the secret as a result of a confidential relationship, and (3) unauthorized use of the secret.' " *Id.* (quoting *Lemmon v. Hendrickson,* 559 N.W.2d 278, 279 (Iowa 1997)).

#### a. "Trade secrets"

This court also addressed what constitutes a "trade secret" under Iowa law in *Walker,* as follows:

IOWA CODE § 550.2(4) defines a trade secret as:

[I]nformation, including but not limited to a formula, pattern, compilation, program, device, method, technique, or process that is both of the following:

a. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by a person able to obtain economic value from its disclosure or use.

b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

IOWA CODE § 550.2(4); *see also Olson v. Nieman's, Ltd.,* 579 N.W.2d 299, 313 (Iowa 1998) (quoting this definition); *Economy Roofing [& Insulating Co. v. Zumaris],* 538 N.W.2d [641,] 646 [(Iowa 1995)] (same). As the Iowa Supreme Court has explained, "trade secrets" are broadly defined under Iowa law:

In a recent case we gave a broad interpretation of "information" that could legally constitute "trade secrets":

Under the plain language of [IOWA CODE § 550.2(4)] "trade secret" is defined as "information" and eight examples of this term are provided. Although these examples cover items normally associated with the production of goods, "trade secrets" are not limited to the listed examples. Business information may also fall within the definition of a trade secret, including such matters as maintenance of data on customer lists and needs, source of supplies, confidential costs, price data and figures. One commentator explains:

Trade secrets can range from customer information, to financial information, to information about manufacturing processes to the composition of products. There is virtually no category of information that cannot, as long as the information is protected from disclosure to the public, constitute a trade secret.

We believe that a broad range of business data and facts which, if kept secret, provide the holder with an economic advantage over competitors or others, qualify as trade secrets.

*US West Communications, Inc. v. Office of Consumer Advocate,* 498

N.W.2d 711, 714 (Iowa 1993) (citations omitted).

*Economy Roofing*, 538 N.W.2d at 646–47 (emphasis in original omitted). The Iowa Supreme Court has also explained that whether or not something is a "trade secret" is "a mixed question of law and fact." *Id.* at 649. The "legal part of the question" of whether or not something is a "trade secret" is embodied in the first part of the statutory definition of "trade secret" in § 550.2(4), *i.e.*, " 'trade secret' means information, including but not limited to a formula, pattern, compilation, program, device, method, technique, or process. . . ." *Id.* at 648 (quoting § 550.2(4)). On the other hand, "the fact part of the question arises from the remaining portion of the definition of trade secret in section 550.2(4)," *i.e.*, the requirements of subparagraphs *a* and *b. Id.* at 648–49. On a motion for summary judgment, of course, the court must determine whether or not the plaintiff has generated genuine issues of material fact on the "fact part of the question," before the existence of a trade secret becomes a question for the jury. *See Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548[, 91 L.Ed.2d 265] (if a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law"); *In re TMJ Implants Prod. Liab. Litig.*, 113 F.3d at 1492.

*Walker Mfg., Inc.*, 261 F.Supp.2d at 1080.

■ Application of these standards can be brief in this case. First, the court has no hesitation finding, as to the "legal" part of the question, *id.*, that the information identified by CSIS and CPI as having been downloaded by McCullough—including lists of CSIS's and CPI's customers and the manufacturing representative contracts, company information about histories of company pump and valve sales, contracts, prices, vendor sources, sales literature, phone contacts, equipment database, and inventory—fits the statutory definition of the first part of § 550.2(4), because it is sufficiently like "information, including but not limited to a formula, pattern, compilation, program, device, method, technique, or process," Iowa Code § 550.2(4), and "customer information" or "financial information." *See Walker Mfg., Inc.*, 261 F.Supp.2d at 1080 (quoting *Economy Roofing & Insulating Co.*, 538 N.W.2d at 646–47, in turn quoting *US West Communications, Inc.*, 498 N.W.2d at 714).

■ Moreover, as to the "fact part of the question" of whether or not the information that McCullough downloaded includes "trade secrets," the court concludes that there are genuine issues of material fact as to whether the information "[d]erived independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by a person able to obtain economic value from its disclosure or use," and "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *See id.* at 1080 ("the fact part of the question" is the requirements of § 550.2(4)(a) & (b)). Such genuine issues of material fact come, first, from Anderson's affidavit so averring, on matters on which he reasonably has first hand knowledge, and from the very provisions of the 1998 Employment Agreement prohibiting disclosures of such information, which suggest that CPI used reasonable efforts to maintain the secrecy of the purported "trade secrets."

### b. *"Misappropriation"*

Satisfied that there are at least genuine issues of material fact as to the "existence"

of trade secrets, the court turns to McCullough's contention that the plaintiffs cannot, as a matter of law, show any "misappropriation" of those trade secrets. *See Walker Mfg., Inc.*, 261 F.Supp.2d at 1079 (in addition to the existence of a trade secret, the plaintiff must show " 'acquisition of the secret as a result of a confidential relationship,' " and " 'unauthorized use of the secret.' ") (quoting *Lemmon*, 559 N.W.2d at 279). Section 550.2(3) of the Iowa Code defines misappropriation as doing any of the following:

> a. *Acquisition of a trade secret by a person who knows that the trade secret is acquired by improper means.*
>
> b. *Disclosure or use of a trade secret by a person who uses improper means to acquire the trade secret.*
>
> c. Disclosure or use of a trade secret by a person who at the time of disclosure or use, knows that the trade secret is derived from or through a person who had utilized improper means to acquire the trade secret.
>
> d. *Disclosure or use of a trade secret by a person who at the time of disclosure or use knows that the trade secret is acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.*
>
> e. Disclosure or use of a trade secret by a person who at the time of disclosure or use knows that the trade secret is derived from or through a person who owes a duty to maintain the trade secret's secrecy or limit its use.
>
> f. Disclosure or use of a trade secret by a person who, before a material change in the person's position, knows that the information is a trade secret and that the trade secret has been acquired by accident or mistake.

Iowa Code § 550.2(3) (emphasis added). CSIS and CPI specifically contend that McCullough's conduct constituted "misappropriation" as defined in the italicized provisions, (a), (b), and (d). Subsections (a) and (b) require use of "improper means" to acquire the trade secrets. "Improper means" are, in turn, defined by statute as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage, including but not limited to espionage through an electronic device." Iowa Code § 550.2(1).

 Contrary to McCullough's assertions, the court concludes that there are at least genuine issues of material fact that he "misappropriated" trade secrets. McCullough does not deny that he downloaded certain information, which the court held, above, could reasonably be found to be "trade secrets." As to the definition of "misappropriation" in § 550.2(3)(a), there are genuine issues of material fact that when McCullough downloaded the information he "[a]cqui[red] a trade secret" when he was "a person who [knew]" that doing so was by "improper means," specifically, in "breach of a duty to maintain secrecy" of the information pursuant to the terms of the 1998 Employment Agreement. *See* Iowa Code § 550.2(1) (defining improper means). There are also genuine issues of material fact that McCullough "misappropriated" trade secrets, as "misappropriation" is defined in § 550.2(3)(b), where the court concluded above, in reference to Count II, that there are genuine issues of material fact as to whether McCullough "disclos[ed] or use[d]" trade secrets that he had downloaded from the CPI database, and there are further genuine issues of material fact that he did so when he was "a person who use[d] improper means to acquire the trade secret," where the "improper means," again, are "breach of a duty to maintain secrecy" of the information pursuant to the terms of the 1998 Employment Agreement. *See* Iowa Code § 550.2(1) (defining improper means). Finally, there are genuine issues

of material fact as to whether McCullough "misappropriated" trade secrets as "misappropriation" is defined in § 550.2(3)(d), where there are genuine issues of material fact that McCullough "disclos[ed] or use[d]" trade secrets while he was "a person who at the time of disclosure or use kn[e]w that the trade secret [wa]s acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use," specifically, where he knew that he acquired the trade secrets while under a contractual duty to maintain their secrecy and limited use pursuant to paragraph 5 of the 1998 Employment Agreement.

Thus, McCullough is not entitled to summary judgment on the plaintiffs' Trade Secrets Act claim in Count III of their Complaint.

### D. Breach Of Fiduciary Duty

Finally, the court turns to McCullough's motion for summary judgment on the plaintiffs' breach-of-fiduciary-duty claim in Count IV of their Complaint. That claim alleges that McCullough has breached fiduciary duties owed to CPI, including but not limited to his duty of loyalty and his duty not to take for unauthorized purposes or to disclose information that his employer regarded as confidential, and that he has done so (1) by soliciting and enticing employees of CPI to leave their employment with CPI to commence employment with a direct competitor, Fluid Solutions, and (2) by improperly taking, using, retaining, and removing CPI's trade secret information. Complaint, Count IV. McCullough also seeks summary judgment on this claim.

In their resistance to McCullough's motion for summary judgment, the plaintiffs also contend that there is evidence that McCullough usurped corporate opportunities of CPI by advising CPI not to acquire Lincoln Supply, particularly where the evidence shows that Fluid Solutions subsequently took over Lincoln Supply's role as

distributor and integrator for Waukesha in Iowa and Nebraska. They also contend that McCullough usurped a corporate opportunity by attempting to purchase Fluid Technology, when the opportunity to do so was a corporate opportunity that belonged to CPI. However, neither of these alleged "usurpations of corporate opportunities" is alleged as a breach of fiduciary duty in the plaintiffs' Complaint. *See* Complaint, Count IV. Similarly, the plaintiffs contend that there are genuine issues of material fact that McCullough arranged with Waukesha and Wilden to take their product lines with him to Fluid Solutions. However, this purported violation of McCullough's fiduciary duty also is not alleged in the plaintiffs' Complaint. *See id.* Likewise, nothing like the alleged "poaching" of General Mills as a customer for Fluid Solutions is alleged as a breach of fiduciary duty in the plaintiffs' Complaint. *Id.* Therefore, the court will disregard the plaintiffs' arguments regarding alleged breach of fiduciary duty based on these "unpleaded" allegations.

### 1. Arguments of the parties

McCullough argues, as he has with other claims, that there is absolutely no evidence to support the plaintiffs' allegations that he took, used, retained, or removed any trade secrets or proprietary information belonging to the plaintiffs in breach of a fiduciary duty. He also argues that the plaintiffs have no evidence that he solicited or enticed employees of CPI to leave their employment for jobs at Fluid Solutions in breach of a fiduciary duty. McCullough points out that Don Hull has never left his employment with CPI. He also contends that he did not "solicit" either Christiaan Nielsen or Tim Bracht, both of whom left their employment with CPI for jobs with Fluid Solutions, because there is no evidence that he initiated contact with any CPI employees, and no evidence that he

ever discussed employment at Fluid Solutions with any CPI employees.

The plaintiffs, however, contend that, during his employment, McCullough claimed that if he left, Christiaan Nielsen would come with him, and that the record shows that his claim was fulfilled when Nielsen did, indeed, resign from CPI on the same day that McCullough did, and then went to work with McCullough at Fluid Solutions. Thus, they appear to contend that there is an inference from McCullough's and Nielsen's conduct that McCullough solicited Nielsen to leave CPI when he did. The plaintiffs also contend that there is evidence that McCullough solicited Hull to leave his employment with CPI, even if Hull did not, ultimately, leave. Although not discussed in the pertinent portion of their brief in resistance to McCullough's motion for summary judgment on their fiduciary duty claim, the plaintiffs elsewhere contend that McCullough also told other employees of CPI that he could take Tim Bracht, another CPI employee, with him to Fluid Solutions, and that Bracht did, indeed, ultimately leave CPI for employment with Fluid Solutions.

In his reply, McCullough notes that the plaintiffs attempt to show that McCullough solicited employees in violation of his fiduciary duties through the affidavit of Mike Langer, but that Langer's affidavit should be stricken for failure to disclose him as a witness or person with information pertinent to the plaintiffs' claims. However, the court reserved the question of whether Langer's affidavit should be stricken until and unless it was shown that whether or not there was a genuine issue of material fact on an issue pertinent to summary judgment depended upon Langer's averments.

### 2. Analysis

#### a. Fiduciary duties

A breach-of-fiduciary-duty claim requires proof of the existence of a fiduciary duty owed by the defendant to the plaintiffs, breach of that duty by the defendant, and damages to the plaintiffs proximately caused by the breach. *See generally Kurth v. Van Horn,* 380 N.W.2d 693 (Iowa 1986). Under Iowa law, a duty of loyalty is a fiduciary duty. *See Cookies Food Products, Inc. v. Lakes Warehouse Distributing, Inc.,* 430 N.W.2d 447, 451 (Iowa 1988). As the Iowa Supreme Court has recognized,

[C]laims by employers against employees for damages resulting from unfair competition and self-dealing are often brought as claims for breach of fiduciary duty. *See Kendall/Hunt Publ'g Co. [v. Rowe],* 424 N.W.2d [235,] 242–43 [(Iowa 1988)]; *Restatement (Second) of Agency* §§ 387–398 (1958). This is because a principal-agent relationship gives rise to a fiduciary duty of loyalty, and an employer-employee relationship can be closely associated with a principal-agent relationship. *See Kurth v. VanHorn,* 380 N.W.2d 693, 696 (Iowa 1986) (principal-agent relationship necessarily gives rise to a fiduciary duty); *Iowa Power & Light Co. v. Abild Constr. Co.,* 259 Iowa 314, 335, 144 N.W.2d 303, 315 (1966) (Iowa law recognizes a very fine line between agent and employee); *see also Kendall/Hunt Publ'g Co.,* 424 N.W.2d at 242–43 (employee found to have fiduciary duty); *Restatement (Second) of Agency* § 429 (1958) (agency's fiduciary duty of loyalty to principal is applicable to employment relationship). Thus, an employee can be held to the same fiduciary duties as an agent, subject to liability for breach of a fiduciary duty.

*Condon Auto Sales & Serv., Inc. v. Crick,* 604 N.W.2d 587, 599 (Iowa 1999).

The Iowa Supreme Court has suggested that, under certain circumstances, a breach-of-fiduciary-duty claim will lie against a former employee who, before his departure, lured or enticed away his former employer's employees. *See id.* at 600 (suggesting that a breach-of-loyalty or breach-of-fiduciary-duty claim would lie for "enticement of employees to leave" a former employer, but not deciding that issue, because the plaintiff failed to show any damages from such activity). The Iowa Supreme Court has also expressly recognized that an employee generally has a fiduciary duty to maintain the secrecy of an employer's trade secrets or proprietary information. *See Economy Roofing & Insulating Co. v. Zumaris,* 538 N.W.2d 641, 648 (Iowa 1995). Other courts have expressly recognized that "enticement of employees" and "appropriation of trade secrets," as well as other conduct, violates a departing employee's fiduciary duty. For example, although a departing employee may prepare to compete, absent a contractual agreement not to, he may not (1) appropriate the company's trade secrets; (2) solicit his employer's customers while still working for his employer; (3) solicit the departure of other employees while still working for his employer, or (4) carry away confidential information, such as customer lists. *Johnson v. Brewer & Pritchard, P.C.,* 73 S.W.3d 193, 202 (Tex.2002) (citing *Augat, Inc. v. Aegis, Inc.,* 409 Mass. 165, 565 N.E.2d 415, 419–20 (1991), for all four of these prohibitions); *Feddeman & Co., C.P.A., P.C. v. Langan Assocs., P.C.,* 260 Va. 35, 530 S.E.2d 668, 672 (2000) ("Liability for breach of fiduciary duty has been imposed when the employees or directors misappropriated trade secrets, misused confidential information, and solicited an employer's clients or other employees prior to termination of employment."). Thus, the fiduciary duties upon which the plaintiffs rely in this case are generally recognized. Moreover, the court finds that

there are, at the very least, genuine issues of material fact that McCullough was subject to such fiduciary duties owing to his position as president and chief operating officer of CPI and CSIS and his contractual duties regarding trade secrets and proprietary information. Indeed, McCullough does not argue otherwise in his motion for summary judgment. Rather, he argues that the plaintiffs cannot generate genuine issues of material fact that he breached the fiduciary duties in question.

### b. Disclosure of proprietary information

The court has already concluded, in reference to the plaintiffs' breach-of-contract and Trade Secrets Act claims, that there are genuine issues of material fact as to whether or not McCullough acquired and then disclosed to his new employer proprietary information or trade secrets of CPI and CSIS. For the reasons previously explained, the court now finds that there are genuine issues of material fact as to whether McCullough's conduct constituted breach of his fiduciary duty to CSIS and CPI not to take, retain, or disclose CPI's trade secret information. Therefore, McCullough is not entitled to summary judgment on that part of the plaintiffs' breach-of-fiduciary-duty claim alleging breach by improperly taking, using, retaining, and removing CPI's trade secret information.

### c. Solicitation of employees

Finally, the court turns to the plaintiffs' claim that McCullough breached his fiduciary duty by soliciting employees of CPI to follow him to his new employer. The Massachusetts Supreme Court explained what might be called the "pied piper" rule, as follows:

> The principle that, before he terminates his employment, a top managerial

employee may not solicit the departure of employees to work for a competitor has been applied in various situations. The rule is most clearly applicable if the supervisor-manager, as a corporate pied piper, leads all his employer's employees away, thus destroying the employer's entire business. *See Barden Cream & Milk Co. v. Mooney, supra* 305 Mass. [545,] 546, 26 N.E.2d 324 [(Mass.1940)] (managers' solicitation of all employer's drivers, at-will employees, to join competitor simultaneously is a breach of duty).

*Augat, Inc. v. Aegis, Inc.,* 409 Mass. 165, 565 N.E.2d 415, 420 (1991); *accord Maryland Metals, Inc. v. Metzner,* 282 Md. 31, 382 A.2d 564, 568 (1978) (analyzing cases considering the extent to which solicitation of employees injured the former employer's business, based at least in part on the number of employees who actually left the company). Some courts hold that a "solicitation" or "enticement" claim will not lie where the employees solicited to leave were at-will employees who had not signed any restrictive covenants. *See Dwyer, Costello and Knox, P.C. v. Diak,* 846 S.W.2d 742, 747–48 (Mo.Ct.App.1993). However, other courts find that the at-will status of the target employees does not necessarily bar such a claim. *See, e.g., Augat,* 565 N.E.2d at 420 (citing *Barden Cream & Milk Co.,* 26 N.E.2d at 324, as holding that solicitation of nearly all of employer's employees, all at-will employees, to join a competitor simultaneously breached the fiduciary duty of loyalty); *accord Setliff v. Akins,* 616 N.W.2d 878, 887 & n. 4 (S.D.2000) (at-will status of the solicited co-employees is not dispositive of the breach-of-fiduciary-duty claim, because whether the soliciting employee "went too far" is a question of fact); *Jet Courier Serv., Inc. v. Mulei,* 771 P.2d 486, 495 n. 11 & 498 (Colo.1989) (*en banc*) (the at-will status of target employees is not dispositive of a breach-of-fiduciary-duty claim

based on a departing employee's solicitation of co-employees). Also, whether or not a departing employee accused of soliciting employees merely presented his colleagues with an opportunity for employment elsewhere, or crossed the line into "solicitation" in violation of a fiduciary duty, is a fact question that is generally for the jury to decide. *See GAB Business Servs., Inc. v. Lindsey & Newsom Claim Servs., Inc.,* 83 Cal.App.4th 409, 424, 99 Cal.Rptr.2d 665, 675 (2000); *accord B & L Corp. v. Thomas & Thorngren, Inc.,* 917 S.W.2d 674, 679 (Tenn.Ct.App.1995). There appears to be general agreement of the courts that, absent a contractual limitation, once an employment relationship comes to an end, the employee is at liberty to solicit his former employer's customers and employees, subject to certain restrictions concerning the misuse of his former employer's trade secrets and confidential information. *See, e.g., Maryland Metals, Inc.,* 382 A.2d at 568; *accord Augat, Inc.,* 565 N.E.2d at 420 ("[B]efore he terminates his employment, a top managerial employee may not solicit the departure of employees.").

■ Even construing the evidence in the light most favorable to the plaintiffs, the court concludes that there are no genuine issues of material fact that McCullough "solicited" either Bracht or Hull to leave their employment with CPI while McCullough was still an employee of CPI. *See Maryland Metals,* 382 A.2d at 568 (solicitation is only forbidden before the departing employee's employment comes to an end); *accord Augat, Inc.,* 565 N.E.2d at 420. Even though McCullough had purportedly boasted that he could get Bracht to leave, too, if he left, Bracht did not actually leave CPI until more than a year after McCullough departed. Indeed, Nielsen's testimony is that he and McCullough did not talk to Bracht about coming to work for Fluid Solutions until October of

2001, a few months after McCullough and Nielsen had left CPI, and Bracht did not leave CPI until almost a year after that. *See* Plaintiffs' Appendix, p. 26, Exhibit 4, Nielsen Deposition at 66–69. Even though the court gave the plaintiffs the opportunity to identify, by letter, post-hearing any evidence that McCullough solicited Bracht, the evidence that they identified in their letter of August 20, 2003, is insufficient to generate a genuine issue of material fact that McCullough "solicited" Bracht to leave CPI while McCullough was still employed by CPI. *See id.; see also* FED. R. CIV. P. 56(e) (the party opposing summary judgment is required to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial"); *accord Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. The plaintiffs point out that Langer avers that McCullough said that he could get Bracht to leave with him. *See* Plaintiffs' Appendix at 7–8 (Langer Affidavit at ¶¶ 5 & 6). This item of evidence fails to generate the necessary genuine issue of material fact, because the boast recounted by Langer was not fulfilled in any reasonable proximity to the time it was made, and thus, there is no reasonable inference of solicitation; rather, Bracht did not leave CPI's employment until more than a year later, by which time McCullough had had legitimate contacts with him concerning employment with Fluid Solutions—that is, contacts after McCullough was no longer employed by CPI or CSIS. *See, e.g., Maryland Metals, Inc.*, 382 A.2d at 568 (for the claim to lie, the solicitation must take place before the defendant leaves the plaintiff's employment); *accord Augat, Inc.*, 565 N.E.2d at 420 ("[B]efore he terminates his employment, a top managerial employee may not solicit the departure of employees."). The plaintiffs also point to McCullough's answer to an interrogatory admitting that

McCullough had "spoken with Mr. Bracht approximately 15 times regarding [Fluid Solutions'] business," but that answer also states that "[p]rior to his employment at [Fluid Solutions], I spoke with him one time while I was working at the [Fluid Solutions] booth at the World Wide Food Expo in Chicago in October 2001." Plaintiffs' Appendix at 54 (McCullough's Answer to Interrogatory 4). Again, this interrogatory answer fails to generate any genuine issues of material fact that McCullough "solicited" Bracht *prior to* the termination of McCullough's employment with CSIS and CPI. Finally, the plaintiffs point to McCullough's recollection of the conversation with Langer in his deposition. *See* Plaintiffs' August 20, 2003, Letter to the Court (attached deposition excerpt). The part of McCullough's testimony upon which the plaintiffs rely, however, does not identify Bracht by name, and more tellingly, does not suggest that McCullough ever encouraged anybody to leave employment with CSIS or CPI, but only criticized CSIS's and CPI's management of its sales force. Thus, there are absolutely no inferences that McCullough "solicited" Bracht away from his employment with CSIS and CPI while McCullough was still employed with the plaintiffs in violation of his fiduciary duty.

 Thus, this part of the plaintiffs' breach-of-fiduciary-duty claim hangs only by the thread of supposed solicitation of Nielsen and Hull by McCullough. That thread is a very slight one to generate a jury question on this part of the plaintiffs' breach-of-fiduciary-duty claim. First, there is nothing in the record that reasonably suggests that McCullough orchestrated the mass departure of employees of CPI as a sort of "pied piper," although that is not the only circumstance in which a "solicitation of employees" claim will lie. *See Augat, Inc.*, 565 N.E.2d at 420; *Maryland Metals, Inc.*, 382 A.2d at 568. A larger problem with the claim is that Hull

never left CPI, so that CPI was not damaged by any attempt by McCullough to entice him away. *See Crick,* 604 N.W.2d at 600 (suggesting that a breach-of-loyalty or breach-of-fiduciary-duty claim would lie for "enticement of employees to leave" a former employer, but not deciding that issue, because the plaintiff failed to show any damages from such activity). The plaintiffs acknowledged at oral arguments that they could not recover damages for any alleged "solicitation" of Hull, although they contend that the evidence that McCullough did try to solicit Hull is relevant to their contentions that he succeeded in soliciting other employees to leave. Recognizing that possibility, the plaintiffs' breach-of-fiduciary-duty claim based on solicitation of employees still hangs only by the thread of alleged solicitation of Nielsen.

 The only purported evidence of "solicitation" of Nielsen that the plaintiffs have been able to marshal is evidence that McCullough purportedly boasted that if he left, Nielsen would also leave, and that Nielsen's departure was "coordinated" with McCullough's, which purportedly suggests the effectiveness of McCullough's solicitation of Nielsen. The court must acknowledge that there are some inferences that McCullough solicited Nielsen to leave his employment with CPI and CSIS, based on the evidence identified by the plaintiffs. However, there is also no indication that Nielsen (or for that matter Bracht or Hull) was *not* an at-will employee, so that he was free to leave at any time. While some courts have held that a "solicitation of employees" claim simply will not lie if the "solicited" employee was an at-will employee, *see, e.g., Dwyer, Costello and Knox, P.C.,* 846 S.W.2d at 747–48 (an "enticement" or "solicitation" claim will not lie if

the employees solicited were at-will and were not subject to any restrictive covenants), the court concludes that the better course is to consider, as a question of fact, whether solicitation of an at-will employee, based on the circumstances of the case—including, for example, the nature of the supposed "solicitation" and the solicited employee's unwillingness to leave his current position but for the solicitor's actions, the solicited employee's position in the company, and the consequent damage to the employer's business of his abrupt departure—constituted solicitation that inflicted sufficient damage to constitute a violation of the defendant's fiduciary duty of loyalty. *See, e.g., Augat,* 565 N.E.2d at 420 (citing *Barden Cream & Milk Co.,* 26 N.E.2d at 324, as holding that solicitation of nearly all of employer's employees, all at-will employees, to join a competitor simultaneously breached the fiduciary duty of loyalty); *accord Setliff,* 616 N.W.2d at 887 & n. 4 (at-will status of the solicited co-employees is not dispositive of the breach-of-fiduciary-duty claim, because whether the soliciting employee "went too far" is a question of fact); *Jet Courier Serv., Inc.,* 771 P.2d at 495 n. 11 & 498 (same); *see also GAB Business Servs., Inc.,* 83 Cal. App.4th at 424, 99 Cal.Rptr.2d at 675 (whether or not a departing employee accused of soliciting employees merely presented his colleagues with an opportunity for employment elsewhere, or crossed the line into "solicitation" in violation of a fiduciary duty, is a fact question that is generally for the jury to decide); *accord B & L Corp.,* 917 S.W.2d at 679.

Therefore, the court will deny McCullough's motion for summary judgment on that part of the plaintiffs' breach-of-fiduciary-duty claim premised on solicitation of employees to leave CPI.[6]

---

6. The court concludes, based on its analysis of McCullough's summary judgment motion, that Langer's affidavit is not critical to gener-

ate any genuine issue of material fact upon which denial of McCullough's motion for

## IV. CONCLUSION

Upon the foregoing, the court concludes that, contrary to McCullough's contentions, there are genuine issues of material fact as to whether or not the plaintiffs are legitimately mad about his conduct prior to and after his departure from their employment. Indeed, the court concludes that there are genuine issues of material fact precluding summary judgment on each of the plaintiffs' claims.

THEREFORE,

1. McCullough's Motion To Strike Affidavits Of Steven Anderson And Mike Langer (docket no. 34) is **granted in part and denied in part**, as explained more specifically herein. **In the alternative**, the motion is **denied in its entirety as moot**, in light of the court's disposition of McCullough's motion for summary judgment.

2. McCullough's Motion for Summary Judgment (docket no. 21) is **denied in its entirety**.

FURTHER, if the plaintiffs designate Michael Langer, Jr., as a witness or potential witness at trial, they must make Langer available for deposition by the defendant at the plaintiffs' expense.

**IT IS SO ORDERED.**

summary judgment depends. Thus, it is not necessary to impose the sanction that the court proposed based on Langer's belated identification as a potential witness or person with information, *at least for purposes of summary judgment*. However, if the plaintiffs intend to call Langer as a witness at trial, the court concludes that the sanctions it proposed *are* appropriate. Therefore, if the plaintiffs designate Langer as a witness or potential witness at trial, they must make Langer available for deposition by the defendant at the plaintiffs' expense.